# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

|  |  |
|---|---|
| **AMIGOS BRAVOS, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 6:09-cv-00037-RB-LFG** |
| ) | |
| **UNITED STATES BUREAU** ) | |
| **OF LAND MANAGEMENT, et al.,** ) | |
| ) | |
| **Federal Defendants** ) | |
| ) | |
| **INDEPENDENT PETROLEUM** ) | |
| **ASSOCIATION OF NEW MEXICO,** ) | |
| ) | |
| **Intervenor-Defendant.** ) | |

_____ )
      *consolidated with*           )
_____ )

|  |  |
|---|---|
| **WILDEARTH GUARDIANS, et al.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 6:09-cv-00414-RB-LFG** |
| ) | |
| **UNITED STATES BUREAU** ) | |
| **OF LAND MANAGEMENT and** ) | |
| **UNITED STATES FOREST SERVICE,** ) | |
| ) | |
| **Federal Defendants,** ) | |
| ) | |
| **INDEPENDENT PETROLEUM** ) | |
| **ASSOCIATION OF NEW MEXICO,** ) | |
| ) | |
| **Intervenor-Defendant,** ) | |
| ) | |
| **CONOCOPHILLIPS COMPANY,** ) | |
| **WILLIAMS PRODUCTION COMPANY, LLC, and** ) | |
| **ENERGEN RESOURCES CORP.** ) | |
| ) | |
| **Intervenor-Defendants.** ) | |

_____ )

## MEMORANDUM OPINION AND ORDER

This matter, in which Plaintiffs seek review of the United States Bureau of Land Management's approval of two quarterly oil and gas lease sales on April 16, 2008 and July 16, 2008, comes before the Court on Amigos Bravos' Opening Brief on the Merits. (Docs. 80.)  In their Responses, Defendants seek dismissal of Plaintiffs' claims for lack of standing. (Docs. 91 & 92.)  Having considered the parties' submissions, the relevant case law, and otherwise being fully informed, the Court concludes Plaintiffs lack standing and dismisses all claims raised in Plaintiffs' First Amended Complaint. (Doc. 21, Case No. 6:09-cv-00037-RB-LFG.)

## I.    BACKGROUND

This civil action arises out of a dispute over whether the United States Bureau of Land Management (BLM) fully considered the issue of climate change, global warming, and greenhouse gases (GHGs) when it approved two quarterly oil and gas lease sales on April 16, 2008 and July 16, 2008.  Several citizen environmental groups, including many of the Plaintiffs in this action, filed protests with BLM, contesting the agency's approval of the lease sales. (Doc. 80 at 14 & 16; APR 661–715; JUL 125–198.)  The environmental groups' protests to the April and July lease sales were subsequently denied by BLM. (APR 95–120; JUL 62–93.)

Having exhausted their administrative remedies, six citizen environmental groups (collectively referred to herein as Amigos Bravos or Plaintiffs) filed a Complaint in the United States District Court for the District of New Mexico on January 14, 2009. (Doc. 1.)  The Plaintiffs filed a First Amended Complaint on May 8, 2009. (Doc. 21.)  In this action (the Climate Change Action), Plaintiffs challenge BLM's decision to approve two quarterly oil and gas lease sales as contrary to the Administrative Procedures Act (APA), the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), and the Mineral Leasing Act

(MLA). (Doc. 21, ¶ 1.)  Plaintiffs claim that BLM failed to meaningfully address the issue of climate change in approving 92 oil and gas leases encompassing some 68,676 acres of New Mexico's federal public lands. (Doc. 80 at 12.)

A separate suit (Case No. 6:09-cv-00414-RB-LFG) challenging the same April 2008 and July 2008 lease sales, in addition to an October 2008 lease sale, was filed by three citizen environmental groups on April 29, 2009.  This second suit (the Ozone Action) challenges BLM's approval of the leases on the basis that the agency failed to properly consider the threat of ozone air pollution resulting from increased oil and gas development.  In the interests of judicial efficiency and to avoid undue delay, confusion, or prejudice, this second suit was consolidated with the present action under FED. R. CIV. P. 42(a) on September 10, 2009. (Docs. 50 & 57.)  This Memorandum Opinion and Order addresses only the parties' arguments in the Climate Change Action. (Docs. 80, 91, 92 & 93.)  Specifically, the Court considers whether Plaintiffs have standing.

## II.    LEGAL STANDARD

### A.    Three Immutable Elements of Standing

As courts of limited jurisdiction, federal courts may only adjudicate those cases that the United States Constitution and Congress have granted them authority to hear. *See* U.S. CONST. Art. III; *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994).  There are three immutable elements of constitutional standing: (1) injury in fact, (2) causation, and (3) redressability. *Steel Company v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Bennet v. Spear*, 520 U.S. 154, 162 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241 (10th Cir. 2008).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) actual or imminent,
> not conjectural or hypothetical.  Second, there must be a causal connection between

the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Defenders of Wildlife*, 504 U.S. at 560–61 (quotations, ellipsis, brackets, and citations omitted).

### B.    Citizen Environmental Groups' Members Must Have Standing to Sue

It is the plaintiff, the "party invoking federal jurisdiction," who bears the burden to prove

standing. *Id.* at 561; *Renne v. Geary*, 501 U.S. 312, 316 (1991); *Marcus v. Kansas Dept. of Revenue*,

170 F.3d 1305, 1309 (10th Cir.1999) ("Because the jurisdiction of federal courts is limited, there

is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears the burden

of proof." (internal quotations omitted)).  The Tenth Circuit requires that a plaintiff "com[e] forward

with evidence of specific facts which prove standing." *Bear Lodge Multiple Use Ass'n v. Babbit*, 175

F.3d 814, 821 (10th Cir. 1999).  In this case, Plaintiffs are six citizen environmental groups suing

to protect their members from climate change and the accompanying environmental harms that will

allegedly result from BLM's approval of 92 separate oil and gas leases on federal lands in New

Mexico. As Plaintiffs are suing on behalf of their members, however, they must demonstrate that

their members would have standing to sue in their own right:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect [through the action] are germane to the organization's purpose; and (c) neither the claim nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

### C.    Relaxed Standing Requirement for Procedural Rights Violations

Plaintiffs argue that they are entitled to a relaxed standing analysis because they assert

procedural violations by BLM in approving the contested oil and gas leases. (Doc. 93 at 10–13.)

4

The Supreme Court and the Tenth Circuit have concluded that where a plaintiff is asserting his procedural rights under NEPA the normal requirements for the redressability element of standing are relaxed.[1] *Mass. v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996) (concluding that the redressability prong is relaxed).

Nevertheless, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009).  In other words, unless a plaintiff can show an injury-in-fact that is (a) actual or imminent and (b) concrete and particularized, the Court must dismiss for lack of standing.

> [D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.  Only a person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.

*Summers*, 129 S. Ct. at 1151.  Thus, while a procedural right "can loosen the strictures of the redressability prong of our standing inquiry," it does not loosen a plaintiff's burden to show a

---

1. Plaintiffs additionally argue that "[a]s with the causation prong, the redressability prong of standing is relaxed in procedural cases." (Doc. 93 at 13.)  Indeed, the fairly traceable requirement does not oblige Plaintiffs to demonstrate to a "scientific certainty" that Defendants' emissions caused the precise harm suffered by Plaintiffs. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000).

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. . . .  What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

*Defenders of Wildlife*, 504 U.S. at 572–73 n. 7.  Neither case specifically imposes a relaxed causation prong.  The standard for all cases seems to be the same—the injury must be "fairly traceable" to the challenged action—which constitutes something less than a scientific certainty.

5

concrete and particularized injury-in-fact. *Id.*; *see also Defenders of Wildlife*, 504 U.S. at 580–81.

       **D.**    **Doctrine of *Parens Patriae***

     Finally, standing may also be relaxed where a State is suing in its capacity as a quasi-sovereign to protect its interests and those of its citizenry from air pollution, global warming, or other environmental threats that endanger the public's health or welfare.  This is so because "the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907).  This was the case in *Mass. v. EPA*, 549 U.S. at 518, where the Supreme Court noted that it was "of considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual." In other words, when a state sues in its *parens patriae* capacity, it "is entitled to special solicitude in our standing analysis." *Id.* at 519–20; *see also Conn. v. Am. Elec. Power Co. Inc.*, 582 F.3d 309, 337–38 (2d Cir. 2009), *rev'd on other grounds and remanded*, 131 S.Ct. 2526 (2011).  In the case at hand, however, the Plaintiffs (six citizen environmental groups) are not States, nor do they constitute a quasi-sovereign, and therefore, this deferential standing analysis does not apply.

**III.**    **ANALYSIS**

     Plaintiffs claim that their members have been injured because the BLM did not properly consider the impact that greenhouse gases emitted through oil and gas development would have on climate change when it approved the sale of 92 oil and gas leases in New Mexico; therefore, Plaintiffs assert that BLM's actions violated NEPA, FLPMA, MLA, and APA.  Before the Court can address the merits of Plaintiffs' claims, however, it must determine whether they have standing. "This requirement assures that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party . . . .' " *Summers*, 129 S.Ct. at 1149 (quoting *Schlesinger v Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)).  Federal Defendants

and Defendant-Intervenor Independent Petroleum Association of New Mexico (IPANM) argue in their Responses to Amigos Bravos' Opening Brief (Docs. 91 & 92) that Plaintiffs lack standing and the Climate Change Action should be dismissed.

## A. Defendants Were Provided Adequate Notice of Plaintiffs' Asserted Grounds for Standing in Amigos Bravos' Opening Brief on the Merits

Federal Defendants argue in their Response to Amigos Bravos' Opening Brief on the Merits that "[b]y failing to meaningfully address standing in their opening brief, Plaintiffs have left [them] to speculate as to the arguments that Plaintiffs may make in their reply brief as to issues on which Plaintiffs bear the burden of proof"; accordingly, immediate dismissal of the case for lack of standing is appropriate. (Doc. 92 at 12–13.)  In other words, Federal Defendants claim that because Plaintiffs failed to meaningfully address the issue of standing in their opening brief, Federal Defendants were prejudiced, and the Court should dismiss the Climate Change Action without further consideration. (Doc. 92 at 13.)

In a district court's review of agency action, it is the plaintiff who carries the burden of production. *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008) ("Because we are reviewing the decision of an administrative agency . . . , the petitioner's burden of production on standing is the same as that of a plaintiff moving for summary judgment in the district court: she must support each element of her claim by affidavit or other evidence.").  Thus, the plaintiff "must either identify in [the administrative] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence . . . ."  *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002); *see also Defenders of Wildlife*, 504 U.S. at 561 ("In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific

facts, which for purposes of the summary judgment motion, will be taken to be true." (internal quotations and citations omitted)).

In Amigos Bravos' Opening Brief, Plaintiffs simply indicate that "Amigos Bravos has standing to bring this case." (Doc. 80 at 13 n 1.)  Plaintiffs then cite to the Declarations of Shirley McNall, Don Schreiber, Taylor Streit, Brian Shields, Gwen Lachelt, and Mike Eisenfeld (members of plaintiff environmental groups Amigos Bravos, Natural Resources Defense Council, San Juan Citizens Alliance, and Earthworks Oil and Gas Accountability Project), which were attached to Amigos Bravos' Opening Brief as Exhibits 1–6. (Docs. 80-1, 80-2, 80-3, 80-4, 80-5, 80-6.)  In the Declarations, the members allege that they have been and will be harmed by climate change occasioned by the release of GHGs from oil and gas wells on BLM land in New Mexico.  The members assert that the GHG emissions resulting from BLM's approval of the oil and gas leases will contribute to climate change, causing earlier winter snow melt, shorter spring runoffs, more intense storms, more silt in the rivers, decreased water quality, longer and more severe droughts, increased risk of forest fires, higher concentrations of pollutants in rivers and lakes, changes to aquatic habitats, reduced trout habitat, reduction or displacement of native aquatic and riparian species, increased stresses on wildlife, declines in both the amount and diversity of wildlife, declines in deer populations and buck size, increased tree mortality due to beetle infestation, degradation of cultural resources, and negative public health impacts.  Accordingly, Declarants allege that they have been harmed by BLM's decision to grant the leases because climate change impacts their present and future ability to use and enjoy New Mexico's federal public lands and/or to earn a living.

In the case at hand, Plaintiffs carry the "burden of production on standing," and are therefore required to "support each element of [their] claim by affidavit or other evidence." *Citizens Against Ruining the Env't*, 535 F.3d at 675; *see also Wyoming Sawmills Inc. v. U.S. Forest Service*, 383 F.3d

1241, 1246 (10th Cir. 2004); *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 821.  Ultimately, Plaintiffs' initial burden is one of *production*; and although a "full development of the arguments for and against standing" is best achieved where the plaintiff fully addresses the issue in its opening brief, *Sierra Club*, 292 F.3d at 900, the Tenth Circuit only requires that plaintiffs "com[e] forward with evidence of specific facts which prove standing." *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 821.  By providing declarations from six of their members, Plaintiffs met their initial burden of production.  Now, the Court considers whether the Declarations are sufficient to support a finding of each of the three elements of standing.

### B.      Plaintiffs Failed to Demonstrate an Injury-in-Fact

The first requirement of standing is that Plaintiffs demonstrate their members suffered an injury-in-fact "which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560–61 (internal quotations and citations omitted).  Standing is not "an ingenious academic exercise in the conceivable"; rather, it minimally requires "a factual showing of perceptible harm." *Id*. at 566.  In cases alleging environmental harm due to an agency's improper decision-making, the Tenth Circuit has broken down the injury-in-fact prong of the Article III standing analysis into two parts: "(1) the litigant must show that in making its decision without following [proper procedure], the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action." *Comm. to Save the Rio Hondo*, 102 F.3d at 449.

In determining whether Plaintiffs suffered an injury-in-fact, the Court must first look at whether BLM's alleged uninformed decisionmaking led to an increased risk of environmental harm that was "actual, threatened, or imminent, not merely conjectural or hypothetical." *Id*. at 449.  In

*Mass. v. EPA*, 549 U.S. at 521–23, the U.S. Supreme Court recognized there is now a fairly clear scientific consensus that greenhouse gas emissions from human activities are increasing average global temperatures and producing changes to the climate. The Court stated, "[t]he harms associated with climate change are serious and well recognized," and discussed the very real threats to global economic interests, human populations, and the continued survival of many species of plants and animals posed by climate change. *Id*. at 521. One of the more certain and measurable risks of climate change is the current and anticipated rise in global sea levels over the next century: the Supreme Court noted, "[a]ccording to petitioners' unchallenged affidavits, global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result of global warming." *Id*. at 522. This was of particular interest because the Commonwealth of Massachusetts owns a significant portion of the State's coastal property, including 53 state parks where it operates recreational facilities, museums, historical monuments, playgrounds, piers, boat launches, and roadways. *Id*. at 522–23. The State therefore alleged that if sea levels continued to rise, it would lose "a significant fraction of coastal property," and the remediation costs "could run well into the hundreds of millions of dollars." *Id*. at 523.

In the case at hand, Plaintiffs allege that climate change will have a negative impact on the New Mexico climate and therefore impinge upon their members' ability to live, recreate, and earn a living. Declarants assert that climate change will lead to, among other harms, less water, decreased biodiversity, siltier rivers, and more forest fires; yet, Plaintiffs present no scientific evidence or formal, recorded observations to support these allegations.[2] Federal Defendants argue

---

2. In Exhibit 1, Shirley McNall, a resident of Aztec, New Mexico, states that she has observed intense changes in the climate and natural environment in San Juan County over the past several years and provides the following examples: San Juan County and New Mexico are in a severe drought; there are more frequent dust storms; this year the snow pack in the mountains is less than usual and will result in water shortages; the native trees and shrubs are dying from drought and bark beetle infestations; wildfires are more numerous; the Animas river can no longer be fished; there are changes in bird migrations; deer populations have dwindled; and drought has altered the wildlife habitat. (Doc. 80-1 ¶ 14.)

that "[n]one of the individuals offering opinions on these subjects . . . assert that they are experts in the relevant scientific fields and they provide no foundation or evidence for their conclusions.  These portions of Plaintiffs' declarations therefore constitute inadmissible evidence and opinion testimony, and cannot be considered in determining whether GHG emissions provide a basis for Plaintiffs' standing." (Doc. 92 at 18.)  At this stage of the litigation, Plaintiffs must come forward with more than just bare assertions of perceived climate changes. *See Am. Elec. Power*, 582 F.3d at 333; *Comm. to Save the Rio Hondo*, 102 F.3d at 450.  Although Declarants may be legitimately concerned about the possible effects of climate change on the New Mexico environment, their allegations are conjectural and hypothetical. *Defenders of Wildlife*, 504 U.S. at 560–61; *Comm. to Save the Rio Hondo*, 102 F.3d at 449.

Declarants paint a bleak picture of the future of New Mexico's environment, but their allegations are not sufficiently reliable or trustworthy to establish injury-in-fact. *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (requiring that an affidavit must be "based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self serving affidavits are not sufficient").  Without any factual support or basis in scientific observation, Declarants statements are pure conjecture.  Consequently, at this stage of litigation, they are

---

In Exhibit 2, Declarant Don Schreiber, owner of Devil Springs Ranch in Rio Arriba County, asserts that climate change has impacted the area in which he lives by causing a decline in grasslands, a reduction in water sources, an increase in weeds and woody plants, a decrease in biodiversity, a decline in deer, elk, bobcats, mountain lions, flammulated owls, spotted owls, red-tail hawks, and Golden Eagles, and a decline in deer and elk populations near the ranch. (Doc. 80-2 ¶ 7.)

In Exhibit 3, Taylor Streit, owner of the Taos Fly Shop, asserts that climate change is making the area rivers siltier and warmer, which negatively impacts the trout populations in the rivers upon which his business depends. (Doc. 80-3 ¶¶ 6–8.) Additionally, Mr. Streit, asserts that the extreme snowfalls in Northern New Mexico have virtually wiped out the turkey population that he used to hunt. (Doc. 80-3 ¶ 9.)

In Exhibit 4, Brian Shields, Executive Director of Amigos Bravos, who lives in Taos, New Mexico, alleges that climate change has caused a reduction in river flows due to increasing evaporation, an increase in water temperature in the rivers, higher concentrations of pollutants in the rivers, an increased threat of forest fires, displacement of native aquatic and riparian species, earlier spring snow melt and runoffs, and an earlier blooming of fruit trees, which makes his orchard more vulnerable to spring freeze. (Doc. 80-4 ¶¶ 10, 21, 24.)

In Exhibit 5, Gwen Lachelt, Director of Earthworks, who resides part-time in Albuquerque, New Mexico, asserts that climate change has caused lower river flows, a shorter runoff season, and increased stresses on wildlife. (Doc. 80-5 ¶¶ 5, 7.)

In Exhibit 6, Mike Eisenfeld, who lives in Farmington, New Mexico, alleges that climate change has created an increased incidence of wildfires, tree mortality, and beetle infestation, the degradation of water quality, and increased drought. (Doc. 80-6 ¶ 7.)

insufficient to confer standing. *Defenders of Wildlife*, 504 U.S. at 561 ("each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation"). On a motion to dismiss, such bare allegations of an injury-in-fact might be sufficient, but here, more is required.

Still, Plaintiffs argue that they have demonstrated injury-in-fact because the Declarations demonstrate "the requisite 'reasonable concerns' and 'reasonable probability' that BLM's procedural violations risk concrete interests." (Doc. 93 at 10.)  Plaintiffs cite to Exhibit 4, ¶¶ 17–26 and Exhibit 6, ¶¶ 4–7,[3] arguing that the Declarants' "review of reports regarding effects of climate change led to reasonable concerns." (Doc. 93 at 10, n. 3.)  Citing to *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961 (9th Cir. 2003), Plaintiffs assert that these "reasonable concerns" are sufficient.  Yet, Plaintiffs must show more than a reasonable concern: in *Citizens for Better Forestry*, the Ninth Circuit concluded that to establish injury-in-fact one need show a "reasonable probability" that the agency's failure to follow proper procedures created an environmental threat to the plaintiffs' concrete interests. *Id.* at 972.  Similarly, the Tenth Circuit requires that a plaintiff show an agency's failure to follow proper procedures "created an increased risk of actual, threatened, or imminent environmental harm." *Comm. to Save the Rio Hondo*, 102 F.3d at 449.

---

3. In Exhibit 4, Declarant Brian Shields, Executive Director of Amigos Bravos, points to a 2006 report by the New Mexico Office of the State Engineer concluding that "[c]limate change will likely have a significant impact on the availability of and demand for New Mexico's water during the next century." (Doc. 80-4 ¶ 17.) Mr. Shields additionally points to a 2007 report by David Gutzler of New Mexico Earth Matters in which he concludes that the climate models "predict an increase in temperature across the state of New Mexico of more than 5°F in winter and about 8°F in summer by the end of the century." (Doc. 80-4 ¶ 19.)  Mr. Shields further points to a 2008 report by Brian Hurd and Julie Conrad that was published by New Mexico State University that predicts "[s]ocial, economic and environmental systems in water-scarce New Mexico and throughout the arid southwest are vulnerable to disruptions in water supplies that are likely to accompany future climate changes." (Doc. 80-4 ¶ 19.)

In Exhibit 6, Declarant Mike Eisenfeld indicates that he is familiar with a report by the Intergovernmental Panel on Climate Change "which concludes that the evidence demonstrating climate change is 'unequivocal,' and that temperature increases are already impacting our natural ecosystems." (Doc. 80-6 ¶ 6.) Mr. Eisenfeld additionally states that he is "aware, as noted by Dr. James Hansen of NASA, that we are reaching 'tipping points,' beyond which consequences to our world will be much more dire." (Doc. 80-6 ¶ 6.)

Notwithstanding the textual differences, both cases require that a plaintiff demonstrate something beyond a reasonable concern over future environmental harm, and the Declarations fail to meet this standard.

Furthermore, while there may be a generally accepted scientific consensus with regard to global climate change, *Mass. v. EPA*, 549 U.S. at 521–23, there is not the same consensus with regard to what the specific effects of climate change will be on individual geographic areas. This is a highly technical field that depends on complex climate mapping and observations taken over many years and decades. Climate change is not uniform; there will be winners and losers, with some areas more affected than others. Thus, Declarants' general assertions that they have noticed a warmer climate or less snow are insufficient to establish an increased risk of actual, threatened, or imminent environmental harm. Such observations are highly subjective and have not been subject to the rigors of the scientific method or peer review. Without proper scientific procedure, it is impossible to determine whether the observed changes were due to global warming, natural fluctuations in the local climate, or Declarants' own subjective perceptions of a changing environment. None of the Declarants indicate that they took temperature or snow depth measurements, kept a journal, or recorded their observations in anything approaching a recognized, scientific methodology. Such unscientific observations are insufficient to demonstrate injury-in-fact. *Los Angeles v. Lyons*, 461 U.S. 95, 108, n. 8 (1983) ("It is the reality of the threat of [] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."). Just as critics of climate change are quick to offer an unusually cold day, month, or winter as proof that global warming is unproven, Declarants present similarly undocumented and unscientific subjective observations of environmental changes as proof of climate change. Article III's requirement of an actual case-or-controversy demands more than such generalized concerns; instead, a plaintiff must

13

provide "a factual showing of perceptible harm." *Defenders of Wildlife*, 504 U.S. at 566.

Additionally, even if the Court were to consider the scientific reports cited in the Declarations—despite the fact that they represent raw conjecture and inadmissible hearsay, *see Murray*, 45 F.3d at 1422 (requiring that an affidavit must be "based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self serving affidavits are not sufficient")—it appears the reports cited primarily discuss changes that are likely to occur over the next century. Nothing in the reports indicate any current harm to the New Mexico environment, or that the harm is particularly imminent. If the increases in temperature and water shortages that the reports predict are not anticipated to occur for many years or decades, then it is questionable whether they represent an actual and imminent threat to Declarants' interests. Plaintiffs have not demonstrated that the alleged harms will come to pass in the Declarants' lifetime or that they are not reversible. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

In sum, Declarants failed to demonstrate that BLM's alleged failure to follow proper procedure "created an increased risk of actual, threatened, or imminent environmental harm." *Comm. to Save the Rio Hondo*, 102 F.3d at 449. In *Mass. v. EPA*, where the Supreme Court found that the Commonwealth of Massachusetts had suffered an injury-in-fact due to the EPA's failure to regulate GHGs, the plaintiffs presented an affidavit from climate scientist Michael MacCracken stating that there was a "strong consensus" among "qualified scientific experts involved in climate change research" that climate change was likely to cause, among other things, "a precipitate rise in sea levels." 549 U.S. at 521. Additionally, according to MacCracken's unchallenged affidavit, "global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result

14

of global warming." *Id*. at 522.  Based on this uncontested expert opinion, and the fact that Massachusetts owned substantial portions of coastline, the Supreme Court concluded that the EPA's failure to regulate greenhouse gas emissions presented a risk of harm to the State that was "both 'actual' and 'imminent.' " *Id*. at 521.

The determinative factors in finding that Massachusetts had standing to contest the EPA's actions were the following: (1) Massachusetts was a landowner of considerable coastal property and (2) that the plaintiffs provided hard evidence of an actual and imminent injury to the State due to rising sea levels. *Id*. at 519 ("That Massachusetts does in fact own a great deal of the 'territory alleged to be affected' only reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power.").  In the case at hand, Plaintiffs' members provide only generalized and unsubstantiated concerns of changes to the environment they perceive as having occurred or as likely to occur at some time in the future. Without more definitive proof of an actual or imminent environmental harm to the members' interests, the Court cannot conclude that Plaintiffs have demonstrated an injury-in-fact.[4]

Next, in addition to demonstrating that BLM's failure to follow proper procedure resulted in "an increased risk of actual, threatened, or imminent environmental harm," Plaintiffs must establish "that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action." *Comm.*

---

4. Notably, in a recent case, *Am. Elec. Power Co.*, 131 S. Ct. at 2535, the Supreme Court split four to four over the issue of whether the plaintiffs had standing.  The Court affirmed the Second Circuit's exercise of jurisdiction "by an equally divided Court." *Id*.  Given the procedural stance of the case (motion to dismiss), it certainly calls into question this Court's standing in the case at hand.  In *Am. Elect Power Co.*, 582 F.3d at 333, 341, the State of California alleged it was injured due to reduced snowpack, earlier melting and associated flooding, reduced summer streamflows, and coastal erosion; however, these allegations were considered in the context of a motion to dismiss, where "Plaintiffs need not present scientific evidence to prove that they face future injury or increased risk of injury."  If the Supreme Court split on the issue of standing in *Am. Elec. Power Co.*, Plaintiffs members' bare assertions of environmental harm in the case at hand are clearly insufficient to establish standing.

*to Save the Rio Hondo*, 102 F.3d at 449.  Federal Defendants assert that "none of the declarations establish that the individual members of Plaintiffs' organizations use the areas that might be affected if any of the 92 lease parcels at issue in this litigation—which are scattered across the vast area of New Mexico—are developed in the future." (Doc. 92 at 15.)  Similarly, Defendant IPANM argues that "[w]ithout a connection to any of the challenged leases, Plaintiffs are raising nothing more than a generalized grievance, which this Court lacks jurisdiction to entertain." (Doc. 91 at 26–27.)

One might analogize Plaintiffs' alleged injuries in the case at hand to claims brought by plaintiffs living downstream from a polluter who discharges hazardous waste into a stream: those living downstream have standing if they can demonstrate concrete and particularized injuries to their economic, recreational, or aesthetic interests in the stream. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (3d Cir. 1990).  For instance, in the Clean Water Act case, *Laidlaw*, 528 U.S. at 184, the plaintiffs' "submissions present[ed] dispositively more than [] mere 'general averments' and 'conclusory allegations.' "  In addition to the affiants' stated concerns regarding water pollution and its effects on their use and enjoyment of specific lands along the river, the record indicated that the company had "consistently failed to meet the permit's stringent 1.3 ppb (parts per billion) daily average limit on mercury discharges," and that the affiants lived or recreated from one-quarter of a mile to forty miles downstream from the company's facility. *Id*. at 176, 181–82.  Thus, the record provided factual support to show that the plaintiffs' injuries were concrete and particularized: the Supreme Court concluded there was "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Id*. at 184.

In the case at hand, however, Plaintiffs have failed to demonstrate a concrete and

particularized interest in the land at issue:  Plaintiffs have not shown that their members use the BLM land subject to the oil and gas leases, or that they have some other geographical nexus to the land.  The Declarants generally allege that they recreate on BLM lands in New Mexico or live in the vicinity of BLM land where there are oil and gas wells; however, none of the Declarants specifically identify that they use any of the lands, or the near vicinity, where BLM approved the oil and gas leases.[5]  In *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990), the Supreme Court stated:

> [W]hether one of respondent's members has been, or is threatened to be, "adversely affected or aggrieved" by Government action . . . is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.  It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege.

Similarly, here, Declarants generally allege that they recreate on public lands throughout New Mexico, but they do not indicate that they have used, or will use in the future, any of the lands that are the object of BLM's allegedly unlawful actions, or what the specific effects of climate change will be on those lands.  Accordingly, the affidavits are devoid of any "geographical nexus" to, or actual use of the site of the agency action. *Comm. to Save the Rio Hondo*, 102 F.3d at 449.

---

5. Shirley McNall states that she does most of her recreation in northwestern New Mexico and that she resides in San Juan County, New Mexico, approximately 700 feet from BLM land where there are several gas wells; yet, she does not indicate that she uses or lives near any of the land at issue in this case. (Doc. 80-1.)

Don Schreiber states that he owns a ranch in Rio Arriba County, New Mexico, which is at the heart of the nation's second largest gas field; but again, there is no mention of his proximity to any of the oil and gas leases at issue in this case. (Doc. 80-2.)

Taylor Streit lives in Taos, New Mexico and guides fly fishing trips in northern New Mexico; however, there is no mention whatsoever of oil and gas wells in his declaration. (Doc. 80-3.)

Brian Shields lives in Taos, New Mexico, he is the Executive Director of Amigos Bravos, and he has recreated or worked as a guide throughout New Mexico and the West; still, there is no mention of how any of the oil and gas leases that Amigos Bravos challenges have directly impacted him. (Doc. 80-4.)  Mr. Shields additionally complains that the organization was not publicly noticed with regard to the challenged leases and was therefore denied the opportunity for participation in the lease approval process (Doc. 80-4 ¶¶ 14 & 22); yet, his Declaration gives no indication of what, if any, ties he or the environmental group's members have to the BLM land at issue such that notice was required.

Gwen Lachelt resides part-time in Albuquerque, New Mexico and has camped, biked, and hiked in many parts of New Mexico, but other than having toured oil and gas wells on ranches in Eddy and Lea County, she mentions nothing about how she has been personally impacted by the oil and gas leases approved by the BLM. (Doc. 80-5.)

Mike Eisenfeld, a resident of Farmington, New Mexico, who lives, works, and recreates in the San Juan Basin, stated that his work often takes him out to the oil and gas fields; however, he provides no indication that he works, or will work, on or near the BLM land where the oil and gas leases were granted. (Doc. 80-6.)

With climate change, the Court must enforce some limits on what constitutes an injury-in-fact; otherwise, it would be overwhelmed by a flood of lawsuits asserting generalized grievances against polluters large and small.  Article III's standing requirement was designed to prevent just this sort of occurrence, limiting disputes to those "which are appropriately resolved through the judicial process," as opposed to legislative or executive action. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982) ("The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.' " (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973))).  In *Mass. v. EPA*, the Supreme Court found standing based primarily on *parens patriae* and Massachusetts' role as the sovereign guardian of all the earth and air within its domain.  In the case at hand, Plaintiffs cannot claim a similar role as sovereign and protector of New Mexico's land, air, and water.  Additionally, Plaintiffs have failed to provide proof of a geographical nexus between their members and the lease parcels that are the subject of this litigation, or even a geographical nexus between their members and the specific geographical regions where the lease parcels are located.  Declarants represent a minuscule slice of the global population, and the effects of climate change, while widely shared, are disparate and uncertain. *Comm. to Save the Rio Hondo*, 102 F.3d at 451.  Additionally, in contrast to *Mass v. EPA*, where Massachusetts' faced a clear threat from rising sea levels, the full magnitude of the climate threat to New Mexico, and the various ecological regions within the State, is not yet fully understood or easily quantified; thus, while climate change may present a well recognized global risk, it is still very difficult to concretely establish the likelihood of harm to a particular region, much less the individual plots of land subject to the 92 oil and gas leases.  In sum, Plaintiffs are less concerned about the harm to the leased lands and their

18

concrete and particularized interests, as they are about the activity conducted on the leased lands and its resulting harm to the environment in general.

"The purpose of the injury-in-fact requirement of Article III is to ensure only those having a direct stake in the outcome, and not those having abstract concerns, may access the courts." *Comm. to Save the Rio Hondo*, 102 F.3d at 451 (internal quotations omitted).  Plaintiffs' interest in BLM's approval of the 92 oil and gas leases amounts to little more than an abstract concern over the possible effects of climate change in New Mexico and the Southwest.  Plaintiffs have failed to show that their members have any more direct stake in the outcome of this case than does every other citizen of New Mexico, or for that matter, the United States.

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Defenders of Wildlife*, 504 U.S. at 574; *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998).  Plaintiffs have failed to show that the alleged environmental risks posed by climate change are actual or imminent, or that Amigos Bravos' members suffered, or will suffer, a concrete and particularized harm.  While Plaintiffs' members—and every other person on Earth—will likely be affected by climate change over the next century, to what extent or in what manner each region of the world or individual will be affected is uncertain.  Plaintiffs presented the generalized grievances and subjective apprehensions of a few of their members with regard to how climate change will affect their ability to live, work, and recreate in New Mexico and the Southwest.  This is not enough to demonstrate an injury-in-fact.  The Court therefore concludes that Plaintiffs failed to demonstrate an injury-in-fact.

### C.      Plaintiffs Failed to Demonstrate Causation

Even assuming, arguendo, that Plaintiffs could establish an injury-in-fact, there is still the issue of causation, the second prong of Article III's standing test.  Federal Defendants argue that the amount of GHGs conceivably attributable to BLM's alleged failure to follow proper procedure in the approval of the oil and gas leases is "minuscule," and therefore, Plaintiffs cannot establish causation based on these emissions. (Doc. 92 at 20–24.)  Furthermore, Federal Defendants argue that if there were no such limitations, "standing would exist for any person living anywhere in the world (who could presumably cite to at least some incremental potential effect of climate change that affects them) to bring a challenge under the APA to virtually any federal agency action on the basis of any incremental contribution to climate change from even a minimal release of GHGs." (Doc. 92 at 22.)  Defendant IPANM argues that the causal chain that Plaintiffs must prove in order to show causation is too attenuated—"they must prove that a particular lessee will decide to develop a lease, that development of that lease will emit GHGs, those GHGs will cause global warming, and that global warming will cause the injuries alleged by Plaintiffs"—therefore, Plaintiffs cannot show that the alleged injury is fairly traceable to BLM's approval of the leases. (Doc. 91 at 27–29.) Plaintiffs counter that the GHG emissions are hardly "tentative," nor "minuscule," and that in *Mass. v. EPA*, 549 U.S. at 524, the Supreme Court "flatly rejected a virtually identical argument." (Doc. 93 at 12.)

To satisfy the causation prong of standing, Plaintiffs' alleged injuries must be "fairly traceable" to the Defendants' actions. *Defenders of Wildlife*, 504 U.S. at 560; *Friends of the Earth*, 204 F.3d at 161 (requiring that plaintiffs demonstrate something less than a "scientific certainty"). In the case of global warming, however, this does not necessarily mean that Plaintiffs must trace their injuries directly to Defendants' emissions.  Considering the large and diffuse number of

polluters throughout the world, and the continuous mixing of GHG emissions in the atmosphere, such an undertaking would be impossible; accordingly, in finding causation, the Court only need consider whether a defendant's emissions "meaningfully contributed" to climate change.  In *Mass. v. EPA*, 549 U.S. at 523–25, the Supreme Court concluded that a causal connection between the EPA's refusal to regulate GHGs and Massachusetts' injuries existed because "U.S. motor-vehicle emissions make a *meaningful contribution* to greenhouse gas concentrations and hence . . . to global warming." (emphasis added).

A similar contribution theory of causation has been applied in cases brought under the Clean Water Act.  Under this approach, it is not necessary that plaintiffs show with absolute scientific certainty that a particular defendant's pollution, and its pollution alone, was responsible for their injuries. *Powell Duffryn*, 913 F.2d at 72.  Rather, provided a plaintiff can demonstrate a "substantial likelihood" that the defendant's conduct caused the injury, that is sufficient. *Id.*; *see also Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008).  In Clean Water Act cases, to determine whether there exists a substantial likelihood, courts apply the following three-part test:

> [T]his likelihood may be established by showing that a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Powell Duffryn*, 913 F.2d at 72; *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996).  In *Am. Elec. Power*, 582 F.3d at 346, the Second Circuit applied this test to the issue of global warming in a public nuisance suit brought against a power company, which was one of the five largest emitters of carbon dioxide in the U.S., concluding that the "third element of the test, []—whether the 'pollutant causes or contributes to the kind of injuries alleged by the

21

plaintiffs'—is relevant to our analysis."  Like pollution emitted into the air, molecules of pollutants released into a waterway readily mix with each other, and there is no way to distinguish molecules originating from one polluter from those originating from another polluter; accordingly, "[r]ather than pinpointing the origins of particular molecules, a plaintiff 'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged.' " *Gaston Copper*, 204 F.3d at 161 (quoting *NRDC v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992)).

Yet, in order for the plaintiffs' injuries to be "fairly traceable" to a particular defendant's actions, the plaintiffs cannot be "so far downstream that their injuries cannot be fairly traced to that defendant." *Gaston Copper*, 204 F.3d at 162.  Unlike pollution in a stream that can be easily traced to a few likely polluters, climate change is a global phenomenon whose manmade causes originated decades or centuries ago with the advent of the industrial revolution and continue today.  Thus, climate change is dependent on an unknowable multitude of GHG sources and sinks, and it is impossible to say with any certainty that Plaintiffs' alleged injuries were the result of any particular action or actions by Defendants.

Returning to the river analogy, there may be hundreds or even thousands of property owners along a river, but generally only a few of them are discharging the target pollutant.  In such a case, a court can reasonably conclude that there is "a substantial likelihood that defendant's conduct caused plaintiff's harm." *Powell Duffryn*, 913 F.2d at 72.  At some point, however, the waterway may become too large, or the plaintiff may be too far removed from the point of discharge for a court to reasonably conclude the pollutant can be fairly traced to the defendant. *See Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996) ("some 'waterways' covered by the CWA may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus in order to satisfy the 'fairly traceable' element of standing").

In the case of global warming, there are literally hundreds of millions, if not billions, of sources of GHGs spewing pollutants into the air and contributing to climate change.  Some of these sources are naturally occurring (i.e., ruminants or volcanoes), some local (as close as the Court's lawnmower), and some far away (a coal-fired power plant on the other side of the globe).  Also, some sources are very minor contributors, while others are almost incomprehensible in scale:  in *Mass. v. EPA*, 549 U.S. at 524, the Supreme Court noted that the U.S. transportation sector accounted for 1.7 billion metric tons of carbon dioxide in 1999, which constituted 6% of the worldwide total for that year.  In the case at hand, BLM's approval of the 92 oil and gas leases in New Mexico—assuming full development of the leases and overestimating emissions—would produce no more than 254,730 metric tons of GHGs per year, amounting to just 0.0009% of global GHG emissions. (Doc. 92 at 21–22.)  The Court must ask whether these GHG emissions will make a "meaningful contribution" to global GHG levels. *See Mass. v. EPA*, 549 U.S. at 524.

With GHGs, every inhabitant of our planet is within the "zone of discharge"; consequently, the issue of geographical proximity to the source of pollution may not be a proper measure of the likelihood of one's injury having been caused by a particular polluter.  The alternative adopted by the Supreme Court appears to be to look at the quantity of GHG emissions produced by a polluter and consider whether the polluter can be said to have made a meaningful contribution to global GHG levels.  Where exactly the Court should draw this line is not clear, but a line must be drawn; otherwise, anyone could be liable for the most innocuous of acts—driving to work, watching the television, or flipping on a light—all of which may contribute to global warming.  Here, the potential 254,730 metric tons of GHGs per year that might result from the approval of the 92 oil and gas leases will not make a particularly meaningful contribution to global emissions.  It stretches credibility to believe that the injuries Plaintiffs' members complain of—less snowpack in winter,

23

earlier runoffs in spring, reduced biodiversity, higher temperatures, decreased availability of water, and siltier rivers—can be said to be fairly traceable to this relatively small amount of GHG emissions. As the Supreme Court stated in *Allen v. Wright*, 468 U.S. 737, 759 (1984): "The links in the chain of causation between the challenged . . . conduct and the asserted injury are far too weak for the chain as a whole to sustain [Plaintiffs'] standing." Accordingly, the Court concludes that Plaintiffs failed to demonstrate causation, the second prong of the Article III standing analysis.

### D.      Plaintiffs Can Likely Meet the Relaxed Redressability Standard

The final prong of the Article III standing test requires that Plaintiffs demonstrate their members' injuries are "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472. Stated another way, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 561 (internal quotations and citation omitted). In cases dealing with agency regulation of GHG emissions, however, a plaintiff does not have to show that a favorable decision would stop or reverse climate change; rather, provided a favorable decision would slow or reduce the pace at which global emissions are increasing, then the plaintiff has satisfied the redressability prong. *Mass. v. EPA*, 549 U.S. at 525–26; *see also Larson v. Valente*, 456 U.S. 228, 244, n. 15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.").

Furthermore, when a plaintiff claims a procedural injury, as in the case at hand, "the normal standards for redressability" are relaxed. *Comm. to Save the Rio Hondo*, 102 F.3d at 452 (quoting *Defenders of Wildlife*, 504 U.S. at 573, n. 7). In the NEPA context, this simply means that the plaintiff must demonstrate that "[c]ompliance with [NEPA] would avert the possibility that the [agency] may have overlooked significant environmental consequences of its action." *Comm. to*

24

*Save the Rio Hondo*, 102 F.3d at 452; *see also Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996).  Given this relaxed standard, Plaintiffs satisfy the redressability prong: if the Court set aside BLM's approval of the leases based on Plaintiffs' assertions that the agency failed to sufficiently consider the issue of GHG emissions, as requested in the First Amended Complaint (Doc. 21), then BLM would have to reevaluate the leases.

"Unlike redressability, however, the requirement of injury in fact is a hard floor of Article III jurisdiction . . . ." *Summers*, 129 S.Ct. at 1151.  Accordingly, this relaxed redressability standard does not change the preceding analysis.  As Plaintiffs bear the burden of establishing all three elements of standing, *Defenders of Wildlife*, 504 U.S. at 561, the fact that Plaintiffs can likely satisfy one prong, does not confer standing.

### E.   Declarants' Allegations of Non-Climate-Change-Related Injuries Do Not Establish Standing in Climate Change Action

In addition to the general allegations of climate change and injury to New Mexico's environment discussed *supra* Sections III (B)–(D), Declarants further allege several local impacts from oil and gas development.[6]  While these allegations provide more than generalized assertions of environmental harm, they are still not sufficient to confer standing.  Plaintiffs' First Amended Complaint of the Climate Change Action (Doc. 21) does not assert any causes of action arising out

---

6.   Shirley McNall asserts the following localized injuries from the oil and gas wells in New Mexico: the wells produce hydrogen sulfide emissions; there are gas vapor emissions in her home; the oil and gas equipment frequently leaks; there are unsightly pits and tanks from which unpleasant odors emanate; there is frequent flaring from the wells; there are loud compressors that emit offensive exhaust fumes; there is a strong odor of gas fumes near the wells; she and her family used to enjoy camping, viewing wildlife, and boating at Navajo Lake State Park, but the noise and odors associated with the wells have caused them to stop going there; while birding near Navajo Lake, the low din and vibration of the compressors gave her a headache; and finally, Ms. McNall asserts that her birding in San Juan County has been marred by the roar and rattle of the gas field equipment and the strong odor of gas fumes and exhaust from the compressor engines. (Doc. 80-1.)

Don Schreiber asserts that the numerous wells near his Devil's Spring Ranch in Rio Arriba County, New Mexico have negatively affected him and his ranch because they decrease beneficial vegetation; they interrupt natural water flow; each well pad disrupts approximately five acres of soil; many of the wells leak methane gas; and the wells discharge nitrogen and other gas fumes into the air near where the ranchers work. (Doc. 80-2.)

Mike Eisenfeld, who lives, works, and recreates in the San Juan Basin in northwestern New Mexico asserts that he has been impacted by the degraded air quality caused by the oil and gas wells in the region. (Doc. 80-6.)

of these alleged injuries; and furthermore, none of the Declarants identified whether they lived, worked, or recreated near the 92 parcels auctioned off in the quarterly oil and gas lease sales.  Thus, while Declarants' allegations provide examples of the kind of concrete and particularized injuries that may satisfy constitutional standing requirements, they do not relate to the harms alleged in the Complaint, and they take aim at the oil and gas industry in general, not at the alleged unlawful conduct—the approval of the quarterly oil and gas lease sales.

In their First Amended Complaint, Plaintiffs assert that the action is justiciable as "the Citizen Groups' interests in BLM public lands and New Mexico's environment will be adversely affected and irreparably injured if BLM continues to violate federal laws as alleged herein." (Doc. 21, ¶ 7.)  Plaintiffs further allege that the Citizen Groups' members use and enjoy BLM and other New Mexico public lands from which they derive "recreational, inspirational, religious, scientific, educational, and aesthetic" benefits. (Doc. 21, ¶ 19.)  Plaintiffs claim that these interests will be harmed because BLM did not properly address the issue of GHG emissions and global warming in its environmental analysis and approval of the April 2008 and July 2008 quarterly oil and gas lease sales. (Doc. 21, ¶ 107.)  Nowhere do Plaintiffs assert that BLM violated federal law by failing to consider noise pollution, unpleasant odors, or any of the other non-climate-change-related injuries alleged in the Declarations.  Accordingly, these allegations do not make Plaintiffs' claims any more justiciable.

Furthermore, none of the Declarants alleged that they lived, worked, or recreated (or planned to do so in the future) near the 92 parcels that were the subject of the oil and gas lease sales at issue in this case.  The Declarations are therefore devoid of any "geographical nexus" to, or actual use of the site of the agency action. *Comm. to Save the Rio Hondo*, 102 F.3d at 449.  Additionally, Plaintiffs have failed to show that these alleged injuries are fairly traceable to the defendant's

26

allegedly unlawful conduct. *Allen*, 468 U.S. at 751.  Consequently, while these additional, non-climate-change-related harms may be more concrete and particularized, Plaintiffs still have not shown a geographical nexus or that they will be personally affected by the challenged agency action. Plaintiffs cannot demonstrate standing by generally attacking the oil and gas industry in New Mexico, but must show that their members have a personal stake in the approval of the 92 oil and gas leases.  Therefore, Declarants' additional non-climate-change-related allegations fail to confer standing.

## IV.    CONCLUSION

Plaintiffs seek review of BLM's approval of two quarterly oil and gas lease sales claiming the agency violated NEPA, FLPMA, MLA, and APA by failing to meaningfully address the issue of climate change. (Doc. 80.)  Defendants counter that Plaintiffs lack standing to bring their claims. (Docs. 91 & 92.)  To show standing, Plaintiffs must demonstrate that they have suffered an injury-in-fact, that is fairly traceable to the Defendants' wrongful conduct, and that can be redressed by a favorable decision from the Court.  Plaintiffs failed to satisfy the first two elements of standing.

Plaintiffs failed to present any reports, articles, or affidavits from experts indicating an actual or imminent threat from climate change to the federal lands where their members live, work, or recreate.  With no factual basis upon which to find an actual or imminent environmental threat—other than the members' subjective observations of changes in the New Mexico climate—Plaintiffs' alleged injuries are too speculative to constitute an injury-in-fact.  Furthermore, Plaintiffs' failed to establish a geographical nexus between their members and the public lands that are the subject of the agency's actions.  Accordingly, Plaintiffs failed the first element of standing.

To satisfy the second element of standing, causation, Plaintiffs must demonstrate that their members' injuries are "fairly traceable" to the Defendants' alleged failure to follow proper

procedure.  Even assuming full development and production, the approval of the 92 oil and gas leases would amount to only 0.0009% of global GHG emissions.  This does not constitute a "meaningful contribution."  Thus, the links in the chain of causation connecting BLM's actions to the alleged harms to New Mexico's environment are too weak to support causation.

The third element of standing, however, is relaxed when a plaintiff is claiming procedural injury.  Plaintiffs could likely satisfy this relaxed standard.  Nevertheless, to establish standing, Plaintiffs must satisfy all three elements.

Declarants' alleged non-climate-change-related injuries do not confer standing.  While these allegations do constitute more concrete and particularized injuries, none of the claims alleged in the First Amended Complaint arise from these injuries, and therefore, they do not make these claims any more justiciable.  Furthermore, Plaintiffs fail to establish a geographical nexus between the alleged injuries and approval of the quarterly oil and gas lease sales or demonstrate that the alleged injuries are fairly traceable to the Defendants' allegedly unlawful behavior.  Declarants generally attack the oil and gas industry in New Mexico, but fail to show that they will be personally harmed by approval of the quarterly oil and gas lease sales.  Thus, the non-climate-change-related injuries are insufficient to confer standing.

**WHEREFORE**, having considered the parties' submissions, the relevant case law, and otherwise being fully informed, the Court hereby **DISMISSES** Plaintiffs' claims in the Climate Change Action (Doc. 21, Case No. 6:09-cv-00037-RB-LFG) for lack of standing.

_____

**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**

28