## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

|  |  |
|---|---|
| AMIGOS BRAVOS, et al., | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) **Case No. 6:09-cv-00037-RB-LFG** |
|  | ) |
| UNITED STATES BUREAU | ) |
| OF LAND MANAGEMENT, et al., | ) |
|  | ) |
| **Federal Defendants** | ) |
|  | ) |
| INDEPENDENT PETROLEUM | ) |
| ASSOCIATION OF NEW MEXICO, | ) |
|  | ) |
| **Intervenor-Defendant.** | ) |

_____ )

*consolidated with*

_____

|  |  |
|---|---|
| WILDEARTH GUARDIANS, et al. | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) **Case No. 6:09-cv-00414-RB-LFG** |
|  | ) |
| UNITED STATES BUREAU | ) |
| OF LAND MANAGEMENT and | ) |
| UNITED STATES FOREST SERVICE, | ) |
|  | ) |
| **Federal Defendants,** | ) |
|  | ) |
| INDEPENDENT PETROLEUM | ) |
| ASSOCIATION OF NEW MEXICO, | ) |
|  | ) |
| **Intervenor-Defendant,** | ) |
|  | ) |
| CONOCOPHILLIPS COMPANY, | ) |
| WILLIAMS PRODUCTION COMPANY, LLC, and | ) |
| ENERGEN RESOURCES CORP. | ) |
|  | ) |
| **Intervenor-Defendant.** | ) |

_____ )

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiffs' Petition for Review of Agency Action. (Doc. 79.)  Plaintiffs assert the United States Bureau of Land Management and the United States Forest Service violated federal law by authorizing oil and gas leasing in the San Juan Basin and the Jicarilla Ranger District of northwestern New Mexico.  Having reviewed the record, carefully considered the parties' submissions and the relevant law, and having otherwise been fully informed, the Court denies Plaintiffs' Petition for Review of Agency Action (Doc. 79), denies Plaintiffs' request for injunctive relieve (Doc. 79), and dismisses all counts of Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (Doc. 40, Case No. 6:09-cv-00414-RB/LFG).

## PARTIES

### I.    PLAINTIFFS

The Plaintiffs in this matter are several citizen environmental groups.  Plaintiff **WILDEARTH GUARDIANS** is a non-profit conservation organization with offices in New Mexico and Colorado.  The organization has approximately 4,500 members.  The organization's goals are to reduce air pollution and to protect the environment and the public's health.  Plaintiff **DINÉ CARE** is an all Navajo non-profit organization incorporated in the Navajo Nation.  The organization works to empower Navajo communities, protect the environment, and promote sustainable development.  Plaintiff **CARSON FOREST WATCH** is a volunteer citizens environmental group based in Peñasco, New Mexico that monitors forest management practices in New Mexico and Colorado.

### II.    FEDERAL DEFENDANTS

Federal Defendants are two United States administrative agencies whose actions are challenged as being arbitrary and capricious.  The **UNITED STATES BUREAU OF LAND MANAGEMENT (BLM)** is an agency within the Department of the Interior and is responsible for

2

administering public lands and subsurface mineral estates underlying federal, state, and private lands. The agency's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. Defendant **UNITED STATES FOREST SERVICE (FOREST SERVICE)** is an agency within the Department of Agriculture responsible for administering the nation's national forests and grasslands. Its mission is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations.

## III.    INTERVENOR-DEFENDANTS

Intervenor-Defendant **INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO (IPANM)** intervened to defend against Plaintiffs' challenge to BLM's approval of three quarterly oil and gas lease sales for the San Juan Basin of northern New Mexico in April, July, and October 2008. Additionally, several oil and gas lessees in the San Juan Basin—**CONOCOPHILLIPS COMPANY, WILLIAMS PRODUCTION COMPANY, LLC,** and **ENERGEN RESOURCES CORP. (LESSEES)**—intervened to defend against Plaintiffs' challenge to the Forest Service's 2008 Final Environmental Impact Statement for Surface Management of Gas Leasing and Development in the Jicarilla Ranger District of the Carson National Forest (2008 EIS) and the accompanying Record of Decision (ROD), adopting Alternative B of the 2008 EIS and authorizing BLM to lease approximately 5,000 acres of National Forest System lands within the Jicarilla Ranger District.

## PROCEDURAL BACKGROUND

This matter (Case No. 6:09-cv-00414-RB-LFG), hereinafter the Ozone Complaint, was consolidated with claims raised by Plaintiffs in a related matter (Case No. 6:09-cv-00037-RB-LFG), hereinafter the Greenhouse Gases Complaint. As these cases share the same administrative record and involve common questions of law and fact, the Court consolidated the cases, concluding that

this would promote the interests of judicial efficiency without causing undue delay, confusion, or prejudice. (Docs. 50 & 57.)

The Ozone Complaint and Greenhouse Gases Complaint arose as challenges to agency action by citizen environmental groups.  In the Ozone Complaint, Plaintiffs argue that BLM and the Forest Service violated federal laws and regulations by their approval of additional oil and gas leasing in the San Juan Basin which would contribute to ozone emissions, impact public health, and reduce visibility in the region.  Plaintiffs WildEarth Guardians and Diné CARE filed timely protests contesting the BLM's approval of the three 2008 quarterly lease sales as arbitrary and capricious. (APR 128–166; JUL 95–124; OCT 110–239.)  Additionally, Plaintiffs WildEarth Guardians and Carson Forest Watch timely appealed the ROD, which issued on December 18, 2008. (FS 27453–78.)  The Forest Service affirmed the ROD on March 19, 2009. (FS 27483–99.)

On September 15, 2009, Plaintiffs filed a First Amended Complaint for Declaratory and Injunctive Relief (Doc. 40 of Case No. 6:09-cv-00414-RB-LFG),[1] asserting that BLM's approval of the three 2008 quarterly oil and gas lease sales and the Forest Service's issuance of the 2008 EIS and ROD permitting additional oil and gas leasing in the Jicarilla Ranger District of the San Juan Basin were made without sufficiently considering the potential environmental impacts of these actions on the San Juan County "air shed" (OC Doc. 40 ¶ 8), and therefore, these actions violated the National Environmental Policy Act (NEPA), the Federal Land Policy Management Act (FLPMA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA). (OC Doc. 40 ¶ 9.)

---

1.  With the exception of Doc. 40 of the Ozone Complaint (Case No. 6:09-cv-00414-RB-LFG), hereinafter OC Doc. 40, all other references to docket entries made herein refer to the docket sheet for the Greenhouse Gases Complaint (Case No. 6:09-cv-00037-RB-LFG), where the majority of the documents have been consolidated.

Plaintiffs filed an Opening Brief: Petition for Review of Agency Action on June 3, 2010, requesting the Court (1) declare that BLM violated NEPA and FLPMA, (2) declare that the Forest Service violated NEPA and NFMA, (3) vacate the 2008 quarterly lease sales, (4) enjoin any oil and gas exploration or development activities on the leased parcels, and (5) enjoin issuance of any new leases in the Jicarilla Ranger District. (Doc. 79.)

Federal Defendants filed a Response on August 16, 2010, arguing that the BLM's approval of the quarterly oil and gas lease sales in 2008 did not violate NEPA or FLPMA, and that the Forest Service's 2008 EIS and ROD did not violate NEPA or NFMA.  Accordingly, Federal Defendants request that the Court dismiss Plaintiffs' appeal of the agencies' actions and enter judgment in Defendants' favor. (Doc. 86.)

Intervenor-Defendants Lessees filed a Response to Plaintiffs' Opening Brief on August 16, 2010, intervening to defend against Plaintiffs' challenge to the Forest Service's 2008 EIS and ROD and requesting that the Court deny Plaintiffs' petition for review of agency action. (Doc. 84.)

Intervenor-Defendant IPANM filed a Response to Plaintiffs' Opening Brief on August 16, 2010, arguing that the BLM's decision to authorize the sale of the oil and gas leases did not violate NEPA or FLPMA and requesting that the Court dismiss Plaintiffs' claims with prejudice. (Doc. 87.)

Plaintiffs filed a Reply in Support of Petition for Review of Agency Action on October 8, 2010. (Doc. 94.)

## **FACTUAL BACKGROUND**

The Ozone Complaint arose out of BLM's approval of three quarterly oil and gas lease sales in April, July, and October 2008 for thirty-three parcels of public land located in the San Juan Basin of northwestern New Mexico, and the Forest Service's 2008 EIS and ROD, approving oil and gas leasing on 5,000 acres of unleased land in the Jicarilla Ranger District of the Carson National Forest,

also located within northwestern New Mexico's San Juan Basin.  Plaintiffs complain that these actions violated NEPA, FLPMA, NFMA, and APA because BLM and the Forest Service acted without fully considering the effects of their actions on ozone concentrations, public health, and visibility in the region; therefore, Plaintiffs assert the agencies' actions were arbitrary, capricious, and not in accordance with the law.

## I.    THE SAN JUAN BASIN

The San Juan Basin encompasses some 16,000 square miles, straddling the border of Colorado and New Mexico.  The New Mexico portion of the Basin includes the entirety of San Juan County, the majority of McKinley County, western Rio Arriba County, and northwestern Sandoval County. (FS 26628; NEPA 3663.)[2]  This area is blessed not only with an abundance of wildlife, recreational opportunities, and natural and scenic beauty, but also with immense oil and gas resources.[3]  This abundance of natural beauty and oil and gas resources has created tension between those groups who live in the region or use the area for recreation, and the oil and gas companies that seek to exploit the mineral resources underlying it.  In the middle of these two groups are the BLM and Forest Service, the federal agencies responsible for managing the public lands and mineral estates in the San Juan Basin.  The BLM and Forest Service are tasked with promoting a multi-use

---

2.  The administrative record in this case consists of two compact discs containing tens of thousands of pages of documents divided into numerous folders and subfolders.  The record was additionally presented to the Court as two searchable indexes, which divided the documents into different sections depending on the nature of each document.  For instance, documents pertaining to the April 2008 lease sale were labeled with an identifying page number preceded by the prefix **APR**.  Documents pertaining to the July 2008 lease sale were labeled with the prefix **JUL**.  Documents pertaining to the October 2008 lease sale were labeled with the prefix **OCT**.  Documents pertaining to NEPA compliance were labeled with the prefix **NEPA**.  Documents containing general information about oil and gas development, research, government policies, manuals, and e-mails and correspondence were labeled with the prefix **GEN**.  And documents pertaining to the Forest Service's 2008 EIS and ROD were labeled with the prefix **FS**.

3.  The San Juan Basin contains an enormous oil and natural gas field with some 18,000 active wells. (NEPA 3663.)  The natural gas field has been in development for the past fifty years, and it is one of the largest fields in the United States. *San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d 1270, 1276–77 (D.N.M. 2008) (Herrera, J.).  The field is crucial in supplying a reliable, domestic source of energy to the United States public. (NEPA 3663.)

management plan for the area, which means encouraging recreational use of the lands, as well as promoting oil and gas production that will help meet the growing energy needs of the United States' public. Nevertheless, the agencies' decisions need not always satisfy both groups; depending on the circumstances, the agencies may determine that one land use is preferable over another. *Park Cty. Resource Council, Inc. v. U.S. Dept. of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 972 (10th Cir. 1992) (concluding that under federal law agencies are not required "to elevate environmental concerns over other appropriate considerations"). Furthermore, under FLPMA, 43 U.S.C. §§ 1701–84, the Mineral Lands Leasing Act, 30 U.S.C. § 181, and the Energy Security Act, 42 U.S.C. § 8701(b)(1), "[i]t is the stated public policy of the United States to make public lands, including national forest land, available for mineral leasing in an effort to reduce our energy dependence on foreign sources and to protect out national security." Accordingly, an agency's decision to allow additional oil and gas development is not arbitrary and capricious merely because it will result in some environmental harm or interfere with other land uses.

## II.   AIR QUALITY IN THE SAN JUAN BASIN

The oil and gas production process produces several pollutants that can be harmful to human health in sufficient concentrations, including ozone. Ozone is formed when volatile organic compounds (VOCs), oxides of nitrogen (NOx), and carbon monoxide (CO) react in the presence of sunlight to form the molecule $O_3$ (ozone). (FS 26757.) NOx, CO, and VOCs are therefore called ozone precursors. In sufficiently large concentrations, ozone can pose serious health risks to the public, particularly for young children, the elderly, or people with respiratory conditions, such as asthma. (73 Fed. Reg. 16436–46.) To protect the public health, the Clean Air Act, 42 U.S.C. §§ 7401–7671q, requires the United States Environmental Protection Agency (EPA) to establish and

7

periodically review national ambient air quality standards (NAAQS) for ozone and five other pollutants. §§ 7408–09. Until recently, the NAAQS for ambient ozone was 0.084 parts per million (ppm); however, as of May 27, 2008, the EPA lowered the ozone NAAQS to 0.075 ppm.[4]

During the summers of 2000 and 2002, ozone levels in the San Juan Basin were approaching non-attainment[5] levels under the NAAQS. (APR 4221; JUL 3784; OCT 4181; NEPA 3675.) In response to this threat, a Four Corners Air Quality Task Force (Task Force) was formed to monitor and reduce ozone emissions, and the New Mexico Environment Department Air Quality Bureau (NMAQB) began conducting additional studies in the area. (NEPA 3675.) Furthermore, local governments in San Juan County entered into an early action compact (EAC) with the EPA to find emissions control measures to reduce ozone precursors and avoid significant impacts to air quality in the region. (NEPA 3675.) In 2003, BLM approved a revised Resource Management Plan and Final Environmental Impact Statement (2003 RMP/EIS) for the region, which provided for the development of 9,942 new oil and gas wells over the following twenty years in the San Juan Basin, in conjunction with several mitigation measures designed to improve the region's air quality. (NEPA 3442, 3675–76.)

Additional monitoring and modeling conducted in 2003 and 2004 (2004 EAC Report) determined that the episodes in 2000 and 2002 were attributable to regional transport and high biogenic source emissions. (APR 4221.) Using air quality modeling to describe future 8-hour average ozone levels for the years 2007 and 2012, the 2004 EAC Report concluded that the region would not violate the NAAQS and that 8-hour ozone trends in the region were steadily declining.

---

4. A **"violation"** of the ozone NAAQS occurs when the 3-year average of the annual fourth highest 8-hour ozone concentrations exceeds 0.075 ppm. 40 C.F.R. § 50.15(b).

5. **"Nonattainment"** is defined as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7404.

(NEPA 4168.)  Furthermore, even if viewed through the lense of the new NAAQS, the 2004 EAC Report indicates that ozone levels in the region will remain in attainment for 2007 and 2012. (NEPA 4167–68, 4236–37.)  Still, with the new, lower ozone standard, the region is close to non-attainment. (JUL 3784.)  Accordingly, the NMAQB and the Task Force have recommended mitigation measures to ensure continuing compliance.  Additional monitoring and modeling is also being discussed. (JUL 3784–85.)  In the end, despite the high level of oil and gas production in the region, at all relevant times during the past fifty years, the San Juan Basin has remained in attainment of federal and state air quality regulations, including the NAAQS for ambient ozone. (NEPA 3483; APR 4220–21; JUL 3784; OCT 4181.)  This success is largely attributable to the local, state, and federal agencies' cooperation in monitoring and mitigating emissions.

## III.    OIL AND GAS LEASING AND DEVELOPMENT PROCESS

The process by which private oil and gas companies lease and then develop federal public lands for oil and gas resource extraction consists of five stages.  The first stage of the process involves the development of a resource management plan (RMP) that serves to broadly assess the potential for oil and gas development on the specified federal land, to determine which areas should be closed to any potential leasing and development, and to determine what restrictions should be placed on the land.  The RMP developed by the BLM or Forest Service is based on an environmental impact statement (EIS), which provides a detailed analysis of the potential environmental impacts of oil and gas development.  The second stage involves the sale of lease parcels to oil and gas companies interested in exploring for oil and gas deposits.  Once the agency identifies which parcels it intends to lease, it holds a competitive lease sale, where the parcels are auctioned off to the highest bidder.  The third stage consists of exploration by private companies for oil and gas deposits on the leased parcels.  If deposits are found, the lessee then proceeds to the fourth stage, development and

extraction; however, before an oil and gas company can do any drilling, it must submit an application for permit to drill (APD), at which point the agency has a second opportunity to review the potential environmental impacts of the proposed action and impose any necessary conditions of approval (COAs).  The fifth and final stage of the process, reclamation, occurs when extraction becomes uneconomical, and the lessee wishes to abandon the well.  At this point, the lessee must return the land to its original condition. *See Chihuahuan Grasslands Alliance v. Norton*, 507 F. Supp. 2d 1216, 1221–22 (D.N.M. 2007), *vacated as moot*, 545 F.3d 884 (10th Cir. 2008).

## IV.    BLM'S APPROVAL OF 2008 QUARTERLY LEASE SALES

While the 2003 RMP/EIS established a regional plan for the development of 9,942 new oil and gas wells in the San Juan Basin, site-specific leasing decisions are made by BLM on an individual basis through quarterly competitive oil and gas lease sales. (NEPA 3665–66.)  At issue in this case is BLM's approval of three quarterly oil and gas lease sales in 2008 pursuant to the 2003 RMP/EIS.  In April 2008, BLM offered for sale leases for seventeen parcels of federal land under the BLM Farmington Field Office's jurisdiction: parcels NM-200804-059 through NM-200804-076. *See BLM Notice of Competitive Oil and Gas Lease Sale*, Apr. 16, 2008 (APR 3713–3841).  In July 2008, BLM offered for sale leases for nine parcels of federal land under the BLM Farmington Field Office's jurisdiction: NM-200807-034 through NM-200807-042. *See BLM Notice of Competitive Oil and Gas Lease Sale*, July 16, 2008 (JUL 3165–3286).  In October 2008, BLM offered for sale leases for seven parcels of federal land under the BLM FFO's jurisdiction: NM-200810-025 through NM-200810-031. *See BLM Notice of Competitive Oil and Gas Lease Sale*, Oct. 22, 2008 (OCT 4075–4176).

BLM prepared environmental assessments (EAs) to consider the impacts of each of the lease sales; the agency then made findings of no significant impact (FONSIs) and authorized the sales.

10

*See EA/FONSI for April 16, 2008 Competitive Oil and Gas Lease Sale*, Feb. 8, 2008
(APR 4201–4255); *EA/FONSI for July 16, 2008 Competitive Oil and Gas Lease Sale*, July 11, 2008,
(JUL 3772–3824); *EA/FONSI for Oct. 22, 2008 Competitive Oil and Gas Lease Sale*, Aug. 4, 2008,
(OCT 4177–4218).  The EA/FONSIs determined that the proposed lease sales conformed with the
2003 RMP/EIS and that more detailed EISs were not required because the authorization of the lease
sales would not have a significant environmental impact.  WildEarth Guardians and Diné CARE
filed timely protests of BLM's decisions to authorize the April 2008 and October 2008 lease sales.
WildEarth Guardians filed a timely protest of BLM's decision to authorize the July 2008 lease sale.
The BLM denied these protests, and Plaintiffs now petition this Court for a review of the agency's
actions.

## V.   FOREST SERVICE'S ISSUANCE OF 2008 EIS AND ROD

Under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (FOOGLRA), the
Forest Service and BLM share responsibility for the issuance of leases on forest lands.[6]  Before
authorizing BLM to lease National Forest System lands for oil and gas development, the Forest
Service is required to verify that the leasing has been adequately addressed in a NEPA document
and that the leasing is consistent with the current forest management plans.  The 1986 Carson
National Forest Land and Resource Management Plan (1986 RMP) governs all resource
management actions in the Jicarilla Ranger District of the Carson National Forest. (FS 1583–1810.)
On July 25, 2008, the Acting Carson National Forest Supervisor signed the ROD (FS 27318–27344),
adopting Alternative B as analyzed and assessed in the 2008 EIS (FS 26597–27317), which
authorized BLM to lease approximately 5,000 acres of currently unleased National Forest System

---

6.  "The Secretary of the Interior [BLM] may not issue any lease on National Forest System Lands reserved
from the public domain over the objection of the Secretary of Agriculture [Forest Service]." 30 U.S.C. § 226(h).

11

lands located within the Jicarilla Ranger District. (FS 27321.)  Plaintiffs assert that the Forest

Service's approval of the 2008 EIS and ROD for the Jicarilla Ranger District of the Carson National

Forest was contrary to the 1986 RMP.  WildEarth Guardians, Carson Forest Watch, and San Juan

Citizen's Alliance timely appealed the ROD. (FS 27453–478.)  The Forest Service affirmed the

ROD on March 19, 2009 (FS 27483), and Plaintiffs now petition the Court for review of the

agency's actions.

## LEGAL BACKGROUND

## I.     NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4370f, is an action

forcing statute that ensures federal agencies take a "hard look" at the environmental effects of their

decisions. *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1224 (10th Cir. 2002).

"The centerpiece of environmental regulation in the United States, NEPA requires federal agencies

to pause before committing resources to a project and consider the likely environmental impacts of

the preferred course of action as well as reasonable alternatives." *New Mexico ex rel. Richardson

v. BLM*, 565 F.3d 683, 703 (10th Cir. 2009) (citing 42 U.S.C. 4331(b)).  Under NEPA, the BLM is

required to:

> include in every recommendation or report on proposals for legislation and other
> major Federal actions significantly affecting the quality of the human environment,
> a *detailed statement* by the responsible official on
>> (i) the environmental impact of the proposed action,
>> (ii) any adverse environmental effects which cannot be avoided should the
>> proposal be implemented,
>> (iii) alternatives to the proposed action,
>> (iv) the relationship between local short-term uses of man's environment and
>> the maintenance and enhancement of long-term productivity, and
>> (v) any irreversible and irretrievable commitments of resources which would
>> be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (emphasis added).  "By focusing both agency and public attention on the

12

environmental effects of proposed actions, NEPA facilitates and allows the political process to check those decisions." *Richardson*, 565 F.3d at 703.

The "detailed statement" described in 42 U.S.C. § 4332(2)(C) is referred to as an EIS. Before preparing a lengthy and expensive EIS, however, agencies will frequently conduct a less-detailed EA as a preliminary step in their analysis. The EA constitutes a more concise statement of the agency's analysis of the potential environmental impacts of a proposed action, which is then followed by a finding of a possible significant impact to the environment, or a finding of no significant impact. *Pennaco Energy, Inc. v. U.S. Dept. of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004) ("agencies need not prepare a full EIS if they initially prepare the less detailed EA, and based on the EA, issue a [FONSI] concluding that the proposed action will not significantly affect the environment"). NEPA does not, however, require any particular environmental outcome; rather, "[t]he sweeping policy goals announced in § 101 of NEPA are [] realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal quotations omitted). Accordingly, in determining whether BLM and Forest Service violated NEPA, the Court must focus on whether the agencies met NEPA's procedural requirements. *Id*. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action.").

## II.     FEDERAL LAND POLICY AND MANAGEMENT ACT (FLPMA)

The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1785, establishes a policy of "multiple use" management for public federal lands. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 877 (1990); 43 U.S.C. § 1732(a) (FLPMA requires the BLM to manage public lands "under principles of multiple use and sustained yield"). Of particular importance in this case, FLPMA's implementing regulations require that all land use authorizations be in compliance with

13

federal air quality standards, including the Clean Air Act's NAAQS for ambient ozone. 43 C.F.R. § 2920.7(b)(3).

## III.  NATIONAL FOREST MANAGEMENT ACT (NFMA)

The National Forest Management Act of 1976, 16 U.S.C. §§ 1600–1614, requires that the Forest Service develop, maintain, and revise land and resource management plans (RMPs) for each unit of national forest under the agency's management. 16 U.S.C. § 1604(a).  In developing these RMPs, the Forest Service must take into account both environmental and commercial development goals. *See* 16 U.S.C. § 1604(e)&(g); 36 C.F.R. § 219.1(a).  Additionally, NFMA requires that the Forest Service's resource management activities be consistent with the RMP. 16 U.S.C. § 1604(i); *Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1224–25 (10th Cir. 2004).

## IV.  ADMINISTRATIVE PROCEDURE ACT (APA)

As NEPA, FLPMA, and NFMA lack their own standard of review, the Court's review of BLM's and Forest Service's actions under these statutes is undertaken pursuant to the provisions of the Administrative Procedure Act of 1946, 5 U.S.C. §§ 701–706. *Hoyl v. Babbitt*, 129 F.3d 1377, 1382 (10th Cir. 1997); *Richardson*, 565 F.3d at 704 ("As with other challenges arising under the APA, we review an agency's NEPA compliance to see whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " (quoting 5 U.S.C. § 706(2)(a))).  The scope of a trial court's review of agency action is limited. *Hoyl*, 129 F.3d at 1382.  The Court must apply a deferential standard to the agency's action, overturning the decision "only if it is arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence." *Hoyl*, 129 F.3d at 1382.  The Court's duty is to determine whether the agency examined the relevant data and to see that there is a rational connection between the facts of the case and the agency's decision. *Olenhouse*, 42 F.3d at 1574.  "Although our inquiry into the record is careful and

searching, we may not substitute our own judgment for that of the agency." *Hoyl*, 129 F.3d at 1383.

"Thus, even though we may not agree with the agency's ultimate findings, we will not set them

aside if they are supported by substantial evidence." *Hoyl*, 129 F.3d at 1383.

## PLAINTIFFS' CLAIMS

In the First Claim for Relief of the Ozone Complaint (Count 1), Plaintiffs allege BLM's

EA/FONSIs for the April, July, and October 2008 quarterly oil and gas lease sales were legally

inadequate and violated NEPA and the APA because they failed to fully analyze the direct, indirect,

and cumulative impacts the leasing activity would have on air quality in San Juan County, in

particular, ozone concentrations that were near the new NAAQS. (OC Doc. 40 ¶¶ 97–102.)

In the Second Claim for Relief of the Ozone Complaint (Count 2), Plaintiffs allege that

BLM's EA/FONSIs for the April, July, and October 2008 quarterly oil and gas lease sales were

legally inadequate and violated NEPA and the APA because they failed to analyze a reasonable

range of alternatives. (OC Doc. 40 ¶¶ 103–08.)

In the Third Claim for Relief of the Ozone Complaint (Count 3), Plaintiffs allege that BLM

violated NEPA and the APA by failing to prepare EISs before approving the April, July, and

October 2008 quarterly oil and gas lease sales and by not preparing EISs before denying Plaintiffs'

protests to the lease sales. (OC Doc. 40 ¶¶ 109–14.)

In the Fourth Claim for Relief of the Ozone Complaint (Count 4), Plaintiffs allege that BLM

violated NEPA and the APA by failing to involve the public in the NEPA process.

(OC Doc. 40 ¶¶ 115–21.)  Specifically, Plaintiffs assert that BLM did not provide notice to the

public that it was preparing EAs for the proposed quarterly oil and gas lease sales, that it did not

provide the public with any information about the potential environmental impacts of the proposed

lease sales, and that the agency did not provide any opportunities for the public to comment on the

potential environmental impacts of the lease sales. (OC Doc. 40 ¶ 117.)

In the Fifth Claim for Relief of the Ozone Complaint (Count 5), Plaintiffs allege that BLM violated FLPMA and the APA by failing to provide for compliance with federal air quality standards for ozone prior to authorizing the quarterly oil and gas lease sales and denying the protests to the lease sales. (OC Doc. 40 ¶¶ 122–29.)

In the Sixth Claim for Relief of the Ozone Complaint (Count 6), Plaintiffs allege that the Forest Service violated NEPA and the APA because the 2008 EIS and ROD approving oil and gas development on 5,000 acres of previously unleased federal lands failed to analyze a reasonable range of alternatives. (OC Doc. 40 ¶¶ 130–34.)

In the Seventh Claim for Relief of the Ozone Complaint (Count 7), Plaintiffs allege that the Forest Service violated NEPA and the APA because the 2008 EIS did not adequately analyze the direct, indirect, and cumulative impacts of oil and gas leasing and development on air quality in the Jicarilla Ranger District. (OC Doc. 40 ¶¶ 135–40.)

In the Eighth Claim for Relief of the Ozone Complaint (Count 8), Plaintiffs allege that the Forest Service violated NFMA and the APA because the 2008 EIS and ROD are inconsistent with the 1986 RMP as they fail to ensure the protection of high quality visual conditions in the Wheeler Peak Wilderness, a class I wilderness area. (OC Doc. 40 ¶¶ 141–44.)

In the Ninth Claim for Relief of the Ozone Complaint (Count 9), Plaintiffs allege that the Forest Service violated NFMA and the APA because the 2008 EIS and ROD failed to ensure compliance with the NAAQS for ambient ozone. (OC Doc. 40 ¶¶ 145–48.)

## ANALYSIS OF CLAIMS AGAINST BLM

In Counts 1–5, Plaintiffs allege that BLM violated NEPA and FLPMA by approving three quarterly oil and gas lease sales in April, July, and October 2008 for lease parcels within the San

Juan Basin of New Mexico without sufficiently considering the environmental impact of the sales on ambient ozone concentrations.  Plaintiffs assert that BLM was aware that ambient ozone levels at various locations throughout San Juan County were already near non-attainment levels at the time of the lease sales, and therefore, approval of additional leases for the region was arbitrary and capricious.  In the following sections, each of Plaintiffs' claims are considered in detail.

## I.      NEPA CLAIMS

Plaintiffs assert that BLM violated NEPA (**A**) by failing in its EA/FONSIs to fully analyze the direct, indirect, and cumulative impacts of its decision to authorize the three quarterly lease sales (Count 1, OC Doc. 40 ¶¶ 97–102); (**B**) by failing in its EA/FONSIs to appropriately analyze a reasonable range of alternatives to the oil and gas lease sales (Count 2, OC Doc. 40 ¶¶ 103–08); (**C**) by failing to prepare an EIS analyzing the environmental impacts of the lease sales (Count 3, OC Doc. 40  ¶¶ 109–14); and (**D**) by failing to adequately involve the public in the NEPA process (Count 4, OC Doc. 40  ¶¶ 115–21).

### A.      Hard Look Analysis

At its heart, NEPA is a "procedural" statute, not an "environmental" statute. *Park Cty.*, 817 F.2d at 620.  NEPA professes no public policy concerning the protection of the environment or natural resources; rather, it "requires only that an agency take a 'hard look' at the environmental consequences of any major federal action." *Id.*; *see also Richardson*, 565 F.3d at 704; *Marsh*, 490 U.S. at 385.  The purpose of NEPA is "to insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action").  "A presumption of validity attaches to the agency action and the burden of proof rests with the [plaintiffs] who challenge such action." *Citizens' Comm. to Save Our*

*Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.  Accordingly, in reviewing BLM's decision to approve the oil and gas lease sales, the Court's analysis must focus on whether the agency's actions complied with relevant NEPA procedures, not the alleged environmental consequences of the sales.

### 1.    BLM's Environmental Impact Analysis

Plaintiffs assert that BLM's analysis in the EA/FONSIs was legally inadequate as it blindly authorized additional leasing without seriously considering the direct, indirect, and cumulative effects ozone emissions from the proposed oil and gas lease sales would have on air quality in the region, and whether the region could continue to comply with the new, lower NAAQS for ozone if additional oil and gas leases were approved. (Doc. 79 at 30–33, 36–42; Doc. 94 at 11–19.)  In determining whether BLM's approval of the lease sales was arbitrary and capricious, the Court must consider the procedures BLM followed in reaching its decision.  BLM's analysis consisted primarily of the preparation of three EA/FONSIs, which tiered[7] to the cumulative ozone analysis of the 2003 RMP/EIS, concluding that the lease sales would not significantly impact the region's air quality. The Court must consider whether BLM's analysis constituted a "hard look" at the potential environmental impacts of the leasing decisions.

In the EA/FONSI prepared for the April 2008 lease sale, dated February 8, 2008 (APR 4201–55), BLM determined that, based on the 2003 RMP/EIS and more recent modeling conducted by the NMAQB (2004 EAC Study), "[t]here is no indication at this time that the approval

---

7.  "Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

of the proposed action would result in a violation of ambient air quality standards." (APR 4221.) BLM noted that "during the summers of 2000 through 2002, ozone levels in San Juan County were approaching non-attainment." (*Id*.) Following the 2004 EAC Study, however, it was determined that these episodes were "attributable to regional transport and high natural biogenic source emissions," not increased oil and gas leasing. (*Id*.) Moreover, modeling by the NMAQB indicated that ozone concentrations in the San Juan Basin would not exceed the NAAQS through 2007. (*Id*.) Consequently, BLM concluded that "[a]ir quality in the areas of the proposed lease tracts is generally good." (*Id*.)

Next, BLM reasoned that "[a]ny potential effects to air quality from the sale of lease parcels would occur at such time that the leases were developed." (APR 4231.) Thus, "[t]he amount of increased emissions cannot be quantified at this time since it is unknown how many wells might be drilled, the types of equipment needed if a well were to be completed successfully . . . , or what technologies may be employed by a given company for drilling any new wells." (*Id*.) Consequently, BLM recommended that additional air quality analysis should be deferred until the APD stage once concrete development plans had been established and a more accurate examination of ozone emissions can be made. Notwithstanding, the agency found that if current APD permitting trends continued, the level of exploration and production likely to occur due to the proposed leasing action would not have a significant impact on overall emissions and ozone levels in the San Juan Basin. (APR 4231, 4242–43.) BLM therefore made a finding of no significant impact and approved the April 2008 quarterly lease sale.

BLM prepared a second EA/FONSI, dated July 11, 2008, prior to the July 2008 quarterly oil and gas lease sale. (JUL 3772–3824.) The air quality analysis of the second EA/FONSI closely followed that of the first. BLM again concluded that "[a]ir quality in the area of the proposed lease

tracts is generally good," acknowledged the high ozone levels in San Juan County during the summers of 2000 through 2002, but concluded they were the result of "regional transport and high natural biogenic source emissions," not increased oil and gas development. (JUL 3784.) BLM noted that the 2004 EAC Study predicted the region would not violate the NAAQS for ozone through 2007 and that ozone levels in the region were declining. (*Id.*) The EA/FONSI additionally noted the recent implementation of a new NAAQS for ozone in May 2008, which lowered the standard for ozone from 0.084 ppm to 0.075 ppm. BLM determined that, under this new standard, "[o]zone levels in the region are now close to exceeding health-based national standards for outdoor air." (*Id.*) To address this issue, the agency indicated that it was working with the Task Force and NMAQB, that it had adopted new emissions standards for wellhead compressor engines as COAs on any future APDs, and that it was working to facilitate additional ozone monitoring, data analysis, and modeling. (*Id.*) Pending the results of the monitoring and modeling, BLM concluded that additional mitigation measures may be necessary at the project specific planning stage. (JUL 3785.) In the end, however, the agency found "[t]here is no indication at this time that the approval of the proposed action would result in a violation of ambient air quality standards." (JUL 3794.) Therefore, BLM made a finding of no significant impact and approved the July 2008 quarterly lease sale.

BLM prepared a third EA/FONSI, dated August 4, 2008, prior to the October 2008 quarterly oil and gas lease sale. (OCT 4177–4218.) The analysis closely followed that of the first two EA/FONSIs. Again, BLM determined that "[t]here is no indication at this time that the approval of the proposed action would result in a violation of ambient air quality standards." (OCT 4181.) BLM discussed the higher summer ozone levels in the region in 2000 through 2002, attributed them to regional transport and high natural biogenic source emissions, and indicated that more recent modeling demonstrated the region would not violate the NAAQS for ozone through 2007. (*Id.*)

BLM acknowledged the need for additional monitoring and data analysis, but concluded that the agency's approval of the lease sale would not have a significant impact on the region's air quality. (*Id*.) Therefore, BLM made a finding of no significant impact and approved the October 2008 quarterly lease sale.

Having reviewed the three EA/FONSIs, the Court concludes that BLM took the requisite "hard look" at the environmental impacts of its actions. Plaintiffs argue that the EA/FONSIs did not adequately address the lease sales' direct, indirect, and cumulative impacts[8] on the region's air quality, and that increased emissions resulting from oil and gas development could result in the region going into non-attainment under the new NAAQS for ozone. Yet, BLM considered this issue in detail. BLM was aware that ozone concentrations were near non-attainment during the summer months of 2000 through 2002 (APR 4221; JUL 3784; OCT 4181); however, additional monitoring and modeling was conducted in 2003 and 2004, and BLM concluded that the region was not in danger of violating the NAAQS. (*Id*.) BLM also recognized that the EPA recently revised downward the NAAQS for ozone, and that ozone levels in the San Juan Basin were again close to exceeding the NAAQS. (JUL 3784.) Still, with ozone levels in the region declining, BLM concluded that air quality was generally good, and that there was no indication approval of the three quarterly oil and gas lease sales would result in a violation of ambient air quality standards. (APR 4220, 4231, 4243; JUL 3784, 3794, 3803; OCT 4181, 4188–89, 4198.) Still, Plaintiffs claim that this analysis was perfunctory. (Doc. 79 at 30–33.)

---

8. A cumulative impact is defined as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7; *see also Utah Envt'l Congress v. Richmond*, 483 F.3d 1127, 1140–41 (10th Cir. 2007).

In determining whether an agency's decision was arbitrary and capricious under NEPA, the

Tenth Circuit has instructed courts to consider the following factors

> An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to
> consider an important aspect of the problem,' (2) 'offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible that
> it could not be ascribed to a difference in view or the product of agency expertise,'
> (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made
> 'a clear error of judgment.' "

*Richardson*, 565 F.3d at 704 (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th

Cir. 2007)).  The purpose of NEPA is "to insure a fully informed and well-considered decision";

however, the agency's decision need not be one that "the judges of the Court of Appeals or of this

Court would have reached had they been members of the decision-making unit of the agency."

*Vt. Yankee*, 435 U.S. at 558.  An agency's decision can only be set aside "for substantial procedural

or substantive reasons as mandated by statute . . . , not simply because the court is unhappy with the

result reached." *Id.*  Ultimately, the burden is on Plaintiffs to establish that the agency's decision was

arbitrary and capricious. *Comm. to Preserve Boomer Lake Park*, 4 F.3d at 1555.

The EA/FONSIs' air quality analysis was not perfunctory.  BLM did not perform any

quantitative emissions analysis for the lease sales or quantify their effect on the region's ambient

ozone concentrations; yet, NEPA does not require this type of detailed analysis at the leasing stage.

NEPA does not unduly burden agencies with analyzing environmental impacts that are not concrete

enough to warrant an inquiry. *Richardson*, 565 F.3d at 717.  To require such analysis at the leasing

stage would present a "gross misallocation of resources." *Park Cty.*, 817 F.2d at 623.  It would be

highly unusual for every lease parcel to be developed, and until an APD is submitted, BLM cannot

determine the extent or type of development planned and the emissions that will result; accordingly,

at this stage, the impacts of the agency's actions on the region's air quality are not reasonably

foreseeable. *See Richardson*, 565 F.3d at 718. ("assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point").

This does not mean the agency can forego all air quality analysis at the leasing stage.  BLM did not, however, ignore the ozone issue.  BLM looked at air quality modeling predicting future ozone concentrations in the San Juan Basin (2003 RMP/EIS and 2004 EAC Study).  There is no assertion that the approval of the leases went outside the level of development considered in the 2003 RMP/EIS.  Rather, Plaintiffs argue that the new NAAQS for ozone made this prior analysis obsolete.  Following the implementation of the new NAAQS for ozone in May 2008, BLM acknowledged that ozone levels in the region were close to exceeding health-based national standards for outdoor air, but that the region would stay in attainment through proper management. To this end, BLM joined the Task Force and continues to work with the NMAQB and other partners to facilitate additional monitoring and analysis and establish appropriate mitigation measures.  If there are any indications the region could slip into non-attainment, BLM can impose additional mitigation measures or deny any new APDs to limit emissions.

Notwithstanding, Plaintiffs argue that BLM's cumulative impact analysis in the EA/FONSI was legally inadequate because it "failed to quantify the total ozone impacts of lease activities combined with ozone emissions from past, present, and reasonably foreseeable activities." (Doc. 79 at 38.)  Defendant-Intervenor IPANM responds that quantitative analysis is not required at this point of the development process because it would require BLM to assume that exploratory drilling and full-field development will occur on each of the leased parcels—"an extremely tentative possibility." (Doc. 87 at 36.)

> Full field development is typically an extremely tentative possibility at best at the leasing stage. . . .  [E]xploration activities are conducted on only about one of ten federal leases issued and development activities are conducted on only one of ten of

those leases on which exploration activities have been approved and completed . . . .

*Park Cty.*, 817 F.2d at 623; *see also Richardson*, 565 F.3d at 717.  To require such detailed analysis at the leasing stage based on an assumption of full field development that will likely never materialize would constitute "a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment." *Park Cty.*, 817 F.2d at 623.  Consequently, in lieu of conducting an in-depth quantitative analysis at the leasing stage based on full field development, BLM relied on its previous modeling and data analysis, and deferred more detailed air quality analysis to the APD stage where such analysis could "measurably improve the decision-making process." *Id*. at 624.

In sum, BLM's environmental impact analysis in the EA/FONSIs was not arbitrary and capricious.  BLM took a hard look at the relevant factors (including the new NAAQS for ozone), considered all important aspects of the problem, offered an explanation for its decision that was plausible and based on the evidence before the agency, and reached a decision that was not a clear error of judgment. *See Richardson*, 565 F.3d at 704.  In conjunction with the NMAQB and the Task Force, BLM continues to monitor and model air quality in the San Juan Basin to ensure the region stays compliant with all state and federal regulations.  While Plaintiffs may have preferred a more cautionary approach, this does not mean BLM's decision to approve the leases was arbitrary and capricious, as NEPA professes no public policy concerning the protection of the environment or natural resources. *Marsh*, 490 U.S. at 385; *Richardson*, 565 F.3d at 704; *Park Cty.*, 817 F.2d at 620. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.

2.      *Tiering*

In its analysis of the environmental impacts of the proposed quarterly lease sales, BLM tiered to the 2003 RMP/EIS' cumulative analysis of oil and gas development in the San Juan Basin.  This use of a more general EIS to avoid cumulative and unnecessary analysis of issues in a subsequent NEPA document is called "tiering."  Plaintiffs assert that the EA/FONSIs' tiering to this earlier study was inappropriate. (Doc. 79 at 38–41.)  Federal Defendants and Defendant-Intervenor IPANM counter that tiering is encouraged under NEPA regulations. (Doc. 86 at 36–40; Doc. 87 at 40–43.)

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28).  Whenever a broad environmental impact statement has been prepared . . . and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy . . . the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20; *see also Pennaco*, 377 F.3d at 1151 ("an agency need not prepare a new EIS to address a proposed action as long as it already has taken a 'hard look' at the action's potential environmental consequences").  Accordingly, Defendants argue BLM's decision to tier to the 2003 RMP/EIS's cumulative air quality analysis was not arbitrary and capricious.

Tiering to a previous EIS is a common practice in the oil and gas context.  Before the decision to open up an area for oil and gas leasing is made, a plan-level EIS is prepared to determine the environmental effects of the proposed action. *Richardson*, 565 F.3d at 716–17.  In the case at hand, BLM prepared the 2003 RMP/EIS[9] to consider expanding leasing in the San Juan Basin and the "cumulative impacts of the potential development of 9,942 new oil and gas wells" on the

---

9. The 2003 RMP/EIS constituted a "hard look" at the issue of air quality in the San Juan Basin. *See San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d at 1290 (having reviewed the 2003 RMP/EIS's discussion of ozone, Judge Herrera concluded that the BLM's NEPA analysis on this issue was not arbitrary and capricious).

region's environment. (NEPA 3665.)  After a regional plan is completed, additional analysis is required at subsequent stages of development to deal with significant, site-specific environmental threats—for instance, the decision to lease a specific parcel or to approve an APD. *See Richardson*, 565 F.3d at 704 ("At all stages throughout the process, the public must be informed and its comments considered."); *Park Cty.*, 817 F.2d at 623 ("As an overall regional pattern or plan evolves, the region-wide ramifications of development will need to be considered at some point."). Nevertheless, where specific environmental threats have not yet solidified, a detailed, site-specific inquiry is not required. *Park Cty.*, 817 F.2d at 623.

In the case at hand, the mere approval of the quarterly lease sales will not significantly impact ozone levels in the San Juan Basin.  The major contribution to ozone levels will occur from the wellhead compressors and the release of fugitive gases during the extraction and production process. (Doc. 79 at 11, 15; FS 26771.)  Before this takes place, however, the purchasers of the leases will have to present a site-specific development plan to BLM and submit an APD, which is subject to the imposition of mitigation measures or other COAs.  Tiering permitted BLM to utilize the previous air quality analysis of the 2003 RMP/EIS without unnecessarily expending resources that would be of little or no use to the current environmental assessment of the agency's leasing decision. *See Park Cty.*, 817 F.2d at 623–24; *Pennaco Energy*, 377 F.3d at 1151 ("[A]n agency need not prepare a new EIS to address a proposed action as long as it already has taken a 'hard look' at the action's potential environmental consequences.").

Nonetheless, Plaintiffs assert that the new NAAQS for ozone prevented BLM from relying on the 2003 RMP/EIS because the cumulative impact analysis relied on the old standard and did not quantify future ozone levels. (Doc. 79 at 39.)  Indeed, the 2003 RMP/EIS did not quantify the ozone concentrations it relied on in concluding that additional oil and gas development in the region would

26

not significantly impact air quality. (NEPA 3675.)  Nevertheless, in reaching this conclusion, the 2003 RMP/EIS relied on a BLM air report that did consider specific emissions data. *See* AIR QUALITY MODELING TECHNICAL ANALYSIS REPORT (2003) (NEPA 3755–3972, 3973–4156).  This report presented hundreds of pages of data and modeling to support the 2003 RMP/EIS and ultimately concluded that "the maximum predicted concentrations would not cause an exceedance of a national or state standard." (NEPA 3768.)  The report was based on an NAAQS of 0.084ppm, but this does not nullify the data or make the analysis irrelevant, as the same data and analysis can be considered in the context of the new, lower NAAQS of 0.075 ppm.

In its cumulative impact analysis, BLM additionally considered the 2004 EAC Report. (APR 4221, 4242; JUL 3784, 3803; OCT 4181, 4198.)  This report was specifically discussed in the 2003 RMP/EIS as an essential component of BLM's continuing efforts to monitor the region's air quality, and vital to determining what additional mitigation measures should be imposed to ensure that the San Juan Basin would continue to meet all applicable air quality standards.

> Monitoring conducted by the [NMAQB] indicates that ozone levels in the San Juan River Valley have approached Clean Air Act non-attainment levels for ozone.  However, insufficient scientific data is available to separate local versus regional sources of the precursors that form ozone.  A Four Corners Ozone Task Force has been formed to develop strategies to further analyze and address the problem.  The BLM is a member of the Task Force steering committee and has submitted a funding request to support additional air quality monitoring and modeling.  The NMAQB has contracted for additional monitoring studies beginning this summer.  Based on the results of monitoring and additional modeling, the BLM may require mitigation to reduce oil- and gas-related impacts to air quality.  Local governments in San Juan County and the New Mexico Environment Department have entered into an Early Action Compact (EAC) with the [EPA].  The EAC group will identify emission control measures to reduce ozone precursors and finalize an emissions reduction process in a Clean Air Action Plan (CAAP) that they propose to submit to the EPA for review by March 31, 2004.  The BLM will use the proposed control measures as the basis for air quality mitigation.
>
> With additional mitigation, BLM expects that significant impacts to air quality will be avoided and that oil and gas operations will meet all applicable air quality standards.

(NEPA 3675.)  Although the 2004 EAC Report fell outside of the record of factors the BLM considered in its "hard look" analysis of ozone in the 2003 RMP/EIS, it did help to complete that analysis and demonstrated BLM's commitment to ensuring the region would continue to remain in compliance with all state and federal air quality standards.  Indeed, this Court gave substantial weight to the 2004 EAC Report in concluding that the 2003 RMP/EIS analysis of the ozone issue satisfied NEPA's "hard look" requirement:

> Given BLM's analysis of ozone once it became an issue, its coordination with other agencies to study the issue further and to develop a strategy to obtain further data, its follow-up once it got that data, its commitment to measures to mitigate ozone, and the fact that the conservative assumptions in the FEIS model resulted in a predicted ozone level far exceeding the actual level, the Court cannot say that BLM's NEPA analysis on this topic was arbitrary and capricious.

*San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d at 1290.  Even the EPA found that the Report met "EPA's modeling requirements and guidelines," and demonstrates that the San Juan Basin will remain "in attainment with the 8-hour ozone NAAQS in 2007 and 2012" with "a maximum ozone design value of 74.78 parts per billion (ppb)." 70 Fed. Reg. 23,076 (May 4, 2005).

Still, Plaintiffs argue that BLM cannot tier to the 2004 EAC Study because it is a non-NEPA document. (Doc. 79 at 41.)  Plaintiffs cite to the Ninth Circuit case, *Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002), where BLM tiered to a document titled the Port Orford Cedar Management Guidelines, which discussed strategies to minimize the spread of a particular fungus.  The Ninth Circuit concluded that tiering to this document was not permissible because it had not been subject to NEPA review:

> [T]iering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA.  While NEPA empowers neither the plaintiffs nor this court to second-guess the BLM's management decisions, it does require the BLM to articulate, publicly and in detail, the reasons for and likely effects of those management decisions, and to allow public comment on that articulation.

*Id*. at 1073.  As the Port Orford Cedar Management Guidelines had not been subjected to the NEPA review process, the panel concluded that BLM's decision to tier to the Guidelines was arbitrary and capricious. *Id*.  The Ninth Circuit's concerns are lessened in the case at hand due to the participation of the NMAQB in the preparation of the report and its endorsement by the EPA as conforming with the agency's modeling requirements and guidelines.  Thus, even though the 2004 EAC Report was not subject to public comment, it does carry certain indicia of reliability.

Furthermore, Defendants point out that *Kern* does not apply to the case at hand because BLM did not tier to the 2004 EAC Report, but merely considered the new information as an update to the ozone analysis contained in the 2003 RMP/EIS. (Doc. 86 at 37; Doc. 87 at 42.)  Additionally, they argue that referencing such non-NEPA information to determine whether changed circumstances require additional NEPA analysis has been upheld by the courts. (Doc. 86 at 37, n. 11; Doc. 87 at 42–43.)  As discussed, *infra*, Section I-A-3, when determining whether a supplemental EIS is appropriate, there is nothing objectionable about an agency considering non-NEPA materials to ascertain whether the current state of analysis in the agency's NEPA documents adequately addresses the situation. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 385 (1989).  The 2004 EAC Report was clearly relevant to BLM's decision to approve the quarterly oil and gas lease sales because it permitted the agency to supplement the 2003 RMP/EIS' analysis with additional data and modeling and make a more reasoned evaluation of whether further analysis of the ozone issue was warranted at the leasing stage.  Plaintiffs may not agree with BLM's ultimate decision, but the Court cannot say that it was arbitrary and capricious for the agency to consider the 2004 EAC Study, in determining whether the 2003 RMP/EIS' air quality analysis was still accurate.

There is no doubt that ozone levels in the San Juan Basin are now very close to non-attainment. (JUL 3784.)  Yet, the recent revision of the NAAQS for ambient ozone does not alter

the previous data or analysis of the 2003 RMP/EIS and 2004 EAC Report which indicate that ozone

levels in the San Juan Basin are below 0.075 ppm and declining.  Thus, while one can argue that

BLM may be playing things closer than it should, this does not mean that its decision to tier to the

2003 RMP/EIS was arbitrary and capricious.  Furthermore, the issue of whether the new NAAQS

for ozone requires the agency to conduct additional monitoring and modeling, and possibly revise

its plans for oil and gas development in the region is precisely the sort of factual dispute that

implicates substantial agency expertise. *See Marsh*, 490 U.S. at 376; *Friends of the Bow v.*

*Thompson*, 124 F.3d 1210, 1218 (10th Cir. 1997).  Accordingly, the Court must defer to the agency

in this matter.  BLM considered the 2003 RMP/EIS and determined that "[t]here has been no change

in the basic assumptions or projections . . . except in regard to air quality." (APR 4242; JUL 3803;

OCT 4198.) But after reviewing the 2004 EAC Study, BLM concluded that "projected development

[was] unlikely to elevate ozone concentrations to significant levels for the foreseeable future."

(APR 4242; JUL 3803; OCT 4198.)  Therefore, additional ozone analysis was not considered

necessary at the leasing stage.  It is not the Court's role to determine whether this was a wise

decision, just whether the BLM took a "hard look" at the relevant information and considered all

important aspects of the problem.  BLM studied the ozone problem in considerable detail, and its

decision to rely on its earlier analysis and tier to the 2003 RMP/EIS was not arbitrary and capricious.

### 3.    *BLM's Decision Not to Prepare an EIS*

Next, Plaintiffs assert that BLM failed to prepare EISs, as required by 42 U.S.C.

§ 4332(2)(C), despite the threat of a violation of the NAAQS for ambient ozone levels and potential

impacts to public health. (Doc. 79 at 52–56.)  Federal Defendants respond that BLM was not

required to prepare EISs because the agency's decision to offer for sale several oil and gas leases

would have no significant impact on the environment and the agency issued the necessary

EA/FONSIs. (Doc. 86 at 49–50.)   Federal Defendants additionally argue that because full development of the leased parcels is not authorized by the issuance of a lease, BLM can defer review of those environmental impacts that are not reasonably foreseeable until the APD stage. (Doc. 86 at 22 & 26.)

Under NEPA, before a major federal action significantly affecting the quality of the human environment is made, an EIS must be prepared. 42 U.S.C. § 4332(2)(C)(i); *see also Pennaco*, 377 at 1150 ("[f]or proposed major federal actions significantly affecting the quality of the human environment, agencies must prepare an environmental impact statement (EIS) in which they consider the environmental impact of the proposed action and compare this impact with that of alternatives to the proposed action." (internal quotations omitted)).   An EIS, however, is not always necessary at the leasing stage: if agency action would not significantly affect the environment, NEPA does not require an EIS, and it can rely instead on a less-detailed EA. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 385 (1989); *Lee v. United States Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004).  "In determining whether to prepare an environmental impact statement [EIS] the Federal agency shall . . . prepare an environmental assessment [EA] . . . ." 40 C.F.R. § 1501.4.  "An EA allows the agency to consider environmental concerns, while reserving agency resources to prepare full EISs for appropriate cases.  If a finding of no significant impact [FONSI] is made after analyzing the EA, then preparation of an EIS is unnecessary." *Sierra Club v. U.S. Dept. of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985). "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (internal quotations omitted).  Accordingly, the Court's review is limited to determining "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment."

31

*Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002) (internal quotations omitted); *see also Marsh*, 490 U.S. at 385; *Pennaco*, 377 F.3d at 1161–62; *Comm. to Preserve Boomer Lake Park. v. Dept. of Transportation*, 4 F.3d 1543, 1555 (10th Cir. 1993).

As discussed in Subsection I-A-2, *supra*, Plaintiffs' NEPA argument focuses on the issue of ozone concentrations in the San Juan Basin as a whole.  Plaintiffs argue that the cumulative impacts of any additional oil and gas leasing will have a negative impact on air quality and human health throughout the San Juan Basin.  While the record indicates that some of the regional monitors have recorded locally higher ozone levels, Plaintiffs do not identify whether the lease parcels fall within these regions.  Accordingly, Plaintiffs' challenge focuses on the region as a whole, and any EIS addressing the ozone issue prepared for the quarterly lease sales would be meaningless without revisiting the cumulative air quality analysis of the 2003 RMP/EIS.  In other words, Plaintiffs call for an EIS addressing the cumulative impact of the lease sales in the context of the region as a whole, similar to the analysis conducted in the 2003 RMP/EIS and 2004 EAC Report.

Plaintiffs' tiering argument is revealing in this respect: "BLM cannot tier to, and in effect rely on, the CIA [cumulative impact analysis] in the 2003 RMP/EIS because that analysis considered cumulative ozone impacts based on the old NAAQS." (Doc. 79 at 39.)  Based on this argument, if BLM were to re-analyze the cumulative air quality impacts discussed in the 2003 RMP/EIS, but applying the new NAAQS, Plaintiffs would be satisfied that BLM took a "hard look" at the issue.  Furthermore, given the nature of ozone, site- or lease-specific EISs would add little to the agency's understanding of the problem.  As ozone and ozone precursors are gaseous, they are easily dispersed, and ozone does not necessarily form in the immediate vicinity of the emissions source.  Additionally, ozone requires sunlight for its creation, and the higher the level of solar radiation and ozone precursors, the more ozone is created.  Accordingly, the amount of ozone varies from day to

32

day, and concentrations can vary widely depending on the wind and weather.  Therefore, any meaningful analysis must look at the cumulative impacts of oil and gas wells, power plants, and other emission sources in the San Juan Basin as a whole.  Thus, without placing the lease sales in the larger context of the regional development plan for the San Juan Basin, a site- or lease-specific analysis would be of little value.  Accordingly, the most effective approach to addressing the issue of air quality in the San Juan Basin would be to prepare a supplemental EIS to the 2003 RMP/EIS and consider an amendment to the regional development plan in light of the new NAAQS.

Of course, the Court's role is limited to determining whether the agency's decision not to prepare an EIS was arbitrary and capricious, not to dictate agency action or policy. *See Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1050 (10th Cir. 1998) (concluding that a court may not substitute its judgment for that of the agency).  It is curious, however, that after calling for a reconsideration of the air quality analysis and development plan laid out in the 2003 RMP/EIS due to the changed NAAQS, Plaintiffs state that Defendant-Intervenor IPANM misinterprets their claim as demanding the preparation of a supplemental EIS. (Doc. 94 at 10 n. 1.)  Ultimately, the type of analysis Plaintiffs request is indistinguishable from a supplemental EIS to the 2003 RMP/EIS on the issue of ozone, and yet they wholly abandon this argument.  To require the preparation of a detailed EIS addressing the issue of ozone concentrations in the San Juan Basin for each and every parcel or future lease sale would be a gross misallocation of resources when such an analysis could be performed for the region as a whole and then, if necessary, used as a basis for an amendment to the current development plan.  In the end, the Court need not consider whether BLM's decision not to prepare a supplemental EIS to the 2003 RMP/EIS was arbitrary and capricious because Plaintiffs affirmatively state that they are not raising such a claim. (Doc. 94 at 10 n. 1.)  Nonetheless, because this seems the most logical solution to the ozone problem in the San Juan Basin—and thus an

33

argument Plaintiffs should not have so swiftly abandoned— a brief discussion follows.

A supplemental EIS is required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).  In the case at hand, the introduction of a new NAAQS for ozone constitutes significant new circumstances relevant to an important environmental concern—human health. When determining whether a supplemental EIS is necessary due to new information or changed circumstances, agencies can utilize "non-NEPA procedures." *Pennaco*, 377 F.3d at 1151. In this case, BLM considered the 2004 EAC Report, which provided further data, modeling, and analysis on the issue of ozone concentrations in the San Juan Basin.  This report concluded that ozone levels in the region were declining and the peak 8-hour ozone concentration would not exceed 0.07478 ppm through 2007 and 2012. (NEPA 4168, 4235.)  While the 2004 EAC Study indicates that peak 8-hour ozone levels in the San Juan Basin may be close to the new NAAQS of 0.075 ppm, the current development plan will not cause the region to go into non-attainment.  Accordingly, the new NAAQS for ozone will not have a significant bearing on the 2003 RMP/EIS' air quality analysis or the current development plan, and BLM's decision not to prepare a supplemental EIS before approving the quarterly oil and gas lease sales was not arbitrary and capricious.

The alternative to preparing a supplemental EIS addressing the entire region, was to prepare EISs for each of the individual lease sales.  Plaintiffs argue that BLM's decision not to prepare EISs analyzing air quality for each of the quarterly lease sales was arbitrary and capricious. (Doc. 79 at 53.)  Plaintiffs cite specifically to two NEPA significance factors that they allege BLM did not take into account in reaching its decision (Doc. 79 at 53): "(1) '[t]he degree to which the proposed action affects public health or safety' and (2) '[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.' " 40 C.F.R.

§ 1508.27(b)(2)&(10)).  The APA requires the reviewing court to "consider whether the [agency] decision was based on a consideration of the relevant factors . . . ." *Marsh*, 490 U.S. 360, 378 (1989).  CEQ regulations provide agencies with some guidance on what constitutes a "significant impact" by establishing factors to determine the intensity of an impact. *Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 268 (D.C. Cir. 1988).  Plaintiffs argue that the "existence of one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those factors or preparation of an EIS." *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003).

The first factor Plaintiffs point to as mandating an EIS is the degree to which BLM's decision to approve the lease sales will affect public health or safety. 40 C.F.R. § 1508.27(b)(2). Indeed, in sufficiently large concentrations, ozone can have a negative impact on public health. 73 Fed. Reg. 16436–46.  The EPA currently considers anything above 0.075 ppm to be a risk to human health.  Yet, it is unlikely that ozone concentrations in the San Juan Basin will exceed the NAAQS for ozone, as levels in the region are generally declining. (NEPA 4168.)  Furthermore, 40 C.F.R. § 1508.27(b)(2) instructs the Court to look at the "degree" to which the action will affect human health.  Thus, even if BLM's decision to approve the quarterly lease sales contribute to the San Juan Basin going into non-attainment, it would likely be by a very small degree, and it would affect only a small segment of the population.

In addition to the "intensity" factors discussed in sub-section (b), section 1508.27(a) instructs the Court to look at the "context" of the proposed action, "such as society as a whole (human, national), the affected region, the affected interests, and the locality."  The San Juan Basin is sparsely populated, and based on the data from different monitors, it is unlikely that the entire region would go into non-attainment. (NEPA 4173–78; OCT 136–37.)  Accordingly, even if there were a

35

violation of the NAAQS, the health impacts on the region, the human population, and the nation as a whole would be minimal.  BLM considered the issue of public health and safety, concluding that its action would present "no new or unusual health or safety concerns issues not covered by existing state and federal laws and regulation" and that "[s]ite specific issue of health and safety are analyzed further at the APD stage of development." (APR 4230; JUL 3791; OCT 4187–88.)  Hence, BLM's decision that the lease sales would not have a significant impact on human health was not arbitrary and capricious.

Plaintiffs further argue that BLM's decision significantly impacts the environment and requires the preparation of an EIS because it "threatens a violation of Federal . . . law or requirements imposed for the protection of the environment," 40 C.F.R. § 1508.27(b)(10), that is, the new NAAQS for ozone. (Doc. 79 at 54.)  Plaintiffs assert that BLM failed to consider "evidence in the record . . . [that] clearly indicated that the area was at or near the ozone NAAQS established under the [Clean Air Act], and that emissions from oil and gas operations were a significant contributor to ozone." (Doc. 79 at 54.)  BLM did, however, extensively consider ozone levels and the new NAAQS (APR 4220–21, 4231, 4242–43; JUL 3783–85, 3793–95, 3803; OCT 4181, 4188–90, 4197–98; NEPA 3674–77), and the information it relied on showed that ozone concentrations in the region were declining.  Thus, while oil and gas operations cumulatively constitute a significant contributor to regional ozone precursor emissions, the lease sales by themselves did not threaten a violation of the NAAQS when placed in the context of the overall development plan for the San Juan Basin.  In sum, BLM's conclusion that its decision would not result in a violation of the NAAQS for ozone did not run counter to the available evidence, it was not implausible, and it did not represent a clear error of judgment.

An agency's decision should only be set aside "for substantial procedural or substantive

reasons as mandated by statute . . . , not simply because the court is unhappy with the result reached." *Vt. Yankee*, 435 U.S. at 558; *see also Robertson*, 490 U.S. at 351 (concluding that NEPA "merely prohibits uninformed—rather than unwise—agency action"). With San Juan County "in attainment" and ozone levels trending downward, BLM's decision to forgo the preparation of an EIS at the leasing stage was not arbitrary and capricious. BLM considered both the public health affects of its decision and the threat of high ozone concentrations in the region and concluded that its actions would not have a significant impact on either. In the context of emissions, an EIS may be more appropriate at the APD stage because the threat level cannot be accurately determined at the leasing stage. Ultimately, the decision of whether or not to prepare an EIS for a given project or environmental threat is "necessarily contextual." *Richardson*, 565 F.3d at 718. In certain cases, an extensive analysis of environmental risks at the leasing stage constitutes a waste of resources, as the full extent of the environmental impact cannot be measured.

> To require a cumulative EIS at the leasing stage in this particular case would be tantamount to "demanding that the [Transportation] Department specify the probable route of a highway that may never be built from points as yet unknown to other points as yet unknown over terrain as yet uncharted in conformity with state plans as yet undrafted. A more speculative exercise can hardly be imagined."

*Park Cty.*, 817 F.2d at 624 (quoting *Cty. of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1379 (2d. Cir. 1977)). A multi-phased NEPA analysis relieves the agency of performing unnecessary and speculative inquiries. *Richardson*, 565 F.3d at 717. In the case at hand, an EIS was not required at the leasing stage because BLM's decision to approve the lease sales will not significantly impact air quality.

Furthermore, under 42 U.S.C. 4332(2)(C)(v), the preparation of an EIS is only necessary when there is an "irretrievable commitment of resources." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006); *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43,

(D.C. Cir. 1999) ("the law does not require an agency to prepare an EIS until it reaches the critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment"); *Park Cty.*, 817 F.2d at 620; *Mobil Oil Corp. v. FTC*, 562 F.2d 170, 173 (2d Cir.1977).   In *Richardson*, 565 F.3d at 718, for example, the Tenth Circuit concluded that an EIS was necessary at the leasing stage "[b]ecause BLM could not prevent the significant environmental impacts resulting from surface use after a lease issued."

The facts of *Richardson*, however, can be distinguished from the case at hand.  In 1997, natural gas was discovered in New Mexico's Otero Mesa (a large expanse of undisturbed Chihuahuan Desert grassland), and companies became interested in obtaining oil and gas leases in the area.  BLM set about amending the RMP for the Otero Mesa and preparing an EIS to address the environmental impacts of oil and gas development. *Id*. at 689.  As in the case at hand, BLM prepared a RMP/EIS.  BLM then moved to the leasing stage without preparing an EIS for the lease sales. *Id*. at 716.  The State of New Mexico argued that an EIS addressing the environmental impacts to the grasslands was necessary prior to the issuance of any leases, and therefore, BLM's actions were arbitrary and capricious. *Id*.  Defendant-Intervenor IPANM argued that NEPA only requires an EIS be prepared at the RMP stage and the APD stage, but there is no need for an EIS at the leasing stage. *Id*.  The Tenth Circuit concluded "there is no bright line rule that site-specific analysis may wait until the APD stage.  Instead, the inquiry is necessarily contextual." *Id*. at 717–18.  "Because BLM could not prevent the impacts resulting from surface use after a lease issued, it was required to analyze any foreseeable impacts of such use before committing the resources." *Id*. at 718.

In *Richardson*, the significant environmental threat at the leasing stage was the surface impacts to the endangered desert grassland ecosystem that would result from exploration, vehicle traffic, and construction of roads prior to the drilling of any wells or extraction of the mineral

resources.  This type of environmental damage occurs prior to the APD stage, regardless of whether a well is ever approved or constructed.  These impacts are reasonably foreseeable before the issuance of any lease not containing a no surface occupancy (NSO) stipulation because, after obtaining a lease, the lessee has the right to explore the parcel to determine whether or not there are any exploitable oil and gas resources, which may cause surface disturbances, especially in a fragile ecosystem such as the Otero Mesa grassland.  Accordingly, in *Richardson*, an analysis of the site-specific surface impacts to the parcels was required before the issuance of any leases, and "BLM acted arbitrarily and capriciously by failing to conduct one." *Id*. at 719.

In the case at hand, however, Plaintiffs do not allege the quarterly lease sales will result in significant environmental impacts to the surface of the lease parcels.  Therefore, in contrast to the immediate environmental threat to the Otero Mesa grasslands that resulted from approval of the lease sales in *Richardson*, here, ozone emissions do not pose a serious environmental threat until the APD stage.  In the case at hand, the major threat to air quality stems from the compressors, flaring, and fugitive gas releases that are a part of the extraction and production processes. (Doc. 79 at 11&15; FS 26771.)  Hence, preparing a detailed EIS of the impacts of lease approval on air quality based on full field development—a highly speculative proposition at the leasing stage—would constitute a waste of resources. *Park Cty.*, 817 F.2d at 623 ("To require a cumulative EIS contemplating full field development at the leasing stage would thus result in a gross misallocation of resources . . . .").

The EAs/FONSIs for the quarterly lease sales address the reasonably foreseeable environmental impacts of the agency's actions.  The primary environmental threat of which Plaintiffs complain—increased ozone air pollution—cannot be fully addressed at the leasing stage because there is no way for BLM to accurately predict the emissions that will ultimately result from

the lease sales.   As Plaintiffs reiterate numerous times in their memoranda, it is oil and gas production, and particularly the wellhead compressors, that emit high levels of ozone precursors and lead to increased ozone concentrations in the San Juan Basin. (Doc. 79 at 11, 15.)  The sale of a lease, however, does not authorize the lessee to drill a well or extract any oil and gas.  Most of the time, production is simply not feasible or economically profitable, and an APD is never pursued. Accordingly, to require BLM to perform a detailed EIS analyzing air quality at the leasing stage would constitute a waste of resources.  Consequently, BLM's decision to defer additional analysis until the APD stage was not arbitrary and capricious because the leasing did not constitute an irretrievable commitment of resources.

### 4.     Conclusion

BLM satisfied NEPA's hard look requirement.  The purpose of the hard look requirement is "to insure a fully informed and well-considered decision." *Vt. Yankee*, 435 U.S. at 558.  An agency's decision should only be set aside where there are substantial procedural or substantive problems. *Id*.  In its environmental impact analysis, BLM took a hard look at the relevant factors, considered the important aspects of the problem, offered an explanation for its decision that was plausible and based on the evidence before the agency, and reached a decision that was not a clear error of judgment.  Additionally, in its cumulative impacts analysis, it was not arbitrary and capricious for BLM to tier to the 2003 RMP/EIS and consider new ozone modeling developed in the 2004 EAC Report.  Lastly, BLM's decision not to prepare an EIS at the leasing stage, but to defer further analysis until the APD stage, was not arbitrary and capricious because the environmental impacts of which Plaintiffs complain were not reasonably foreseeable at the time, and the leasing decision did not constitute an irretrievable commitment of resources.  The Court will therefore deny this portion of Plaintiffs' Petition for Review of Agency Action and dismiss Counts 1

and 3 of the Ozone Complaint.

###### B.    Alternatives Analysis

Plaintiffs argue that BLM violated NEPA by failing to adequately analyze a reasonable range of alternatives.[10] (Doc. 79 at 44–47; Doc. 94 at 16–20.)  Plaintiffs assert that, because none of the three alternatives proposed by BLM in the EA/FONSIs for the April, July, and October 2008 quarterly oil and gas lease sales included measures that would reduce or eliminate ozone precursor emissions and protect air quality, the alternatives were legally inadequate. (Doc. 79 at 45; Doc. 94 at 22.)  Plaintiffs argue that the alternatives should have discussed reducing the number of leases offered based on projected ozone precursor emissions or requiring technological controls to reduce emissions as suggested by Plaintiffs in their Protests. (Doc. 79 at 46.)

Federal Defendants counter that the agency only needed to consider those alternatives that were reasonably feasible at the time of the preparation of the EA/FONSIs. (Doc. 86 at 43.)  Federal Defendants argue the consideration of Plaintiffs' proposed alternatives—reducing the number of leases offered for sale or imposing technological stipulations—would have been impractical, speculative, and ineffective at the leasing stage because it is impossible to calculate the quantity of ozone precursors at that stage, as the sale of a lease does not constitute approval for or guarantee lease development. (Doc. 86 at 43.)  Thus, Defendants argue the consideration of these alternatives was not feasible at the time of leasing because BLM could not predict what tracts would ultimately be developed or to what extent. (Doc. 86 at 43–44.)  Furthermore, as BLM must evaluate mitigation alternatives at the APD stage after development plans have been submitted, Federal Defendants urge

---

10.  BLM discussed three alternatives.  Alternative A was the "no action alternative," under which none of the parcels would be leased.  Alternative B was the "proposed action alternative," under which all of the proposed parcels would be leased.  And Alternative C was the "preferred alternative," under which BLM would offer a limited number of parcels for lease.  BLM adopted Alternative C, the preferred alternative, for each of the three lease sales.

that deferral of this analysis is preferable because it allows BLM to impose the most current mitigation technologies. (Doc. 86 at 44.)

The alternatives analysis is a crucial part of the NEPA process, and agencies must "rigorously explore and objectively evaluate all reasonable alternatives . . . ." 40 C.F.R. § 1502.14(a); *see also* 42 U.S.C. § 4332(2)(C)(iii)&(E).  However, the alternatives and an agency's discussion of those alternatives must be "reasonable," which "applies both to which alternatives the agency discusses and the extent to which it discusses them." *Utahns for Better Transp. v. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002).  Thus, an agency need not consider every possible alternative imaginable.  "NEPA does not require an agency to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective' " *Lee v. USAF*, 354 F.3d 1229, 1238 (10th Cir. 2004) (quoting *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992))); *see also Vt. Yankee*, 435 U.S. at 551 ("the concept of alternatives must be bounded by some notion of feasibility"). Furthermore, in cases where an agency determines that its actions will have no significant environmental impact and issues an EA/FONSI, a less extensive review of alternatives is required. *See Native Ecosystems Council v. Forest Service*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("agency's obligation to consider alternatives under an EA is a lesser one than under an EIS"); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1278–79 (10th Cir. 2004); *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. Fed. Energy Regulatory Comm'n*, 143 F.3d 165, 172 (4th Cir.1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action."); *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994); *Friends of the Ompompanoosuc v. Fed. Energy Reg. Comm'n*, 968 F.2d 1549, 1558 (2d Cir. 1992).

In its EA/FONSIs, BLM determined that any potential impacts to air quality would not occur

until lease development; therefore, deferral of additional alternatives analysis until the APD stage was warranted. (APR 4230–31; JUL 3793–94; OCT 4188–89.)  Furthermore, BLM concluded that without more detailed information on lease development, accurately predicting future emissions was not possible.   In these circumstances, requiring extensive analysis of alternatives would be speculative, impractical, and ineffective. *Lee*, 354 F.3d at 1238.  Notwithstanding, Plaintiffs argue that BLM still could have discussed a broader range of alternatives at the leasing stage—such as unitization[11] or reducing the number of leases offered—which can reduce ozone emissions by dictating the technologies and practices adopted at the APD stage. (Doc. 79 at 45; Doc. 94 at 24.) While discussion of these alternatives at the leasing stage may have been possible, without more details as to the lessees' development plans, they were, at best, still only remote and speculative.

In the end, BLM's decision to defer consideration of mitigation alternatives to the APD stage, once the lessees have cemented their development plans, was not arbitrary and capricious, as this allows mitigation measures to be more finely tuned to each parcel.  Plaintiffs point to *San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d at 1291, where the Court indicated that, to help reduce ozone precursor emissions, "BLM can engage in further mitigation opportunities at the leasing stage through the application of lease stipulations."  Yet, such mitigation measures are not mandatory at the leasing stage, given that they can additionally be imposed as COAs at the APD stage.  Also, the fact that BLM prepared an EA, not an EIS, permitted a less thorough alternatives analysis.  In sum, BLM's decision not to consider alternatives to reduce ozone precursor emissions at the leasing stage was not arbitrary and capricious.  Therefore, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 2 of the Ozone Complaint.

---

11.  Unitization is defined as "the process by which multiple lease holders in a geographic area share facilities so as to reduce surface disturbance caused by multiple duplicate facilities such as pipelines and compressor stations." (NEPA 3468.)

### C.      Public Participation

Next, Plaintiffs argue that BLM failed to involve the public at any point in the NEPA process for its leasing decisions. (Doc. 79 at 49–52.)  Plaintiffs assert that the EAs for the April, July, and October 2008 quarterly lease sales were never circulated to the public for comment, and that BLM never provided any public notice that the agency had prepared the EAs. (Doc. 79 at 51.)  Plaintiffs concede that there is no specific requirement that BLM circulate EAs for public comment in every instance; however, Plaintiffs contend that, at a minimum, BLM was required to inform the public that it was preparing EAs and provide the public with information concerning the environmental impacts of the proposed activity. (Doc. 79 at 51–52.)  Additionally, Plaintiffs assert that, while BLM provided to the public Notices of Competitive Oil and Gas Lease Sales (APR 3713–3841; JUL 3165–3286; OCT 4075–4176), this did not constitute adequate public notice because they did not contain information about the environmental aspects of the lease parcels or possible environmental impacts resulting from the lease sales. (Doc. 79 at 51.)

Federal Defendants counter that they did provide sufficient information to the public regarding BLM's intention to conduct the lease sales and allowed members of the public to play a role in the agency's decision-making process. (Doc. 86 at 47.)  For instance, Federal Defendants note Plaintiffs' protests of the lease sales (APR 128; JUL 95; OCT 110) and their ability to be part of and affect the decision-making process as evidence that BLM provided sufficient notice and an opportunity for public participation. (Doc. 86 at 47.)  Furthermore, BLM placed copies of the EAs in the public room of its Farmington field office, and listed the EAs on BLM's website. (NEPA 766, 773, 777.)  Federal Defendants argue that these procedures went well beyond what is required by law. (Doc. 86 at 48.)

In contrast to an EIS, "public input during the EA process is not required." *TOMAC v.*

*Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (citing Tenth Circuit case *Greater Yellowstone Coal.*, 359 F.3d at 1279 ("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS")).  Federal regulations guiding the NEPA process require that, in the case of an EIS, the agency must make available for public comment an initial draft of the EIS so that it may "[d]evelop and evaluate alternatives not previously given serious consideration by the agency." 40 C.F.R. § 1503.4.  In contrast, for an EA, the agency is only required to involve the public "to the extent practicable." § 1501.4(b).

In sum, although the EAs in this case were not open for public comment, the fact that BLM published Notices of the Lease Sales, made copies of the EAs available to the public at its Farmington field office, listed the EAs on BLM's website, and permitted protests constituted more than adequate public involvement for the issuance of an EA/FONSI.  In the case of the April 2008 quarterly lease sale, BLM actually withdrew its original EA and issued a revised EA to address Plaintiffs' concerns over increased greenhouse gas emissions and climate change. (APR 4201–4255.)  Consequently, BLM satisfied NEPA's public involvement requirement. Therefore, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 4 of the Ozone Complaint.

## II.   FLPMA CLAIMS

Plaintiffs allege that BLM violated FLPMA by failing to provide for compliance with federal air quality standards for ozone prior to authorizing the quarterly oil and gas lease sales and denying the protests to the lease sales. (Count 5, OC Doc. 40 ¶¶ 122–29.)  First, Plaintiffs argue that BLM failed to ensure its leasing authorizations complied with the NAAQS for ozone. (Doc. 79 at 56–59.) Plaintiffs assert that BLM approved the lease sales with evidence in the record that EPA had lowered the NAAQS standard for ambient ozone and that the San Juan Basin was close to slipping into non-

attainment. (Doc. 79 at 57.)  By failing to analyze ozone emissions and whether additional leasing would lead to a violation of the new NAAQS, Plaintiffs argue that BLM's actions were arbitrary and capricious and violated FLPMA. (Doc. 79 at 59.)

Federal Defendants counter that BLM's issuance of the leases did not jeopardize continued attainment of the NAAQS for ambient ozone levels in the San Juan Basin because leasing does not authorize any activity that leads to the production of ozone emissions. (Doc. 86 at 18.)  Furthermore, Federal Defendants argue that the ozone data, modeling, and analysis from the 2003 RMP/EIS and the 2004 EAC Study showed that, even under a "worst-case" scenario for ozone emissions, none of the areas in the San Juan Basin were likely to exceed the new NAAQS. (Doc. 86 at 31.)

It is uncontested that FLPMA and its implementing regulations require BLM to ensure that any land use authorizations provide for compliance with federal and state pollution control laws, including the Clean Air Act. *See* 43 U.S.C. § 1712(c)(8) ("In the development and revision of land use plans, the Secretary shall . . . provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards . . . ."); 43 C.F.R. § 2920.7(b)(3) ("Each land use authorization shall contain terms and conditions which . . . [r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law . . . .").  In the case at hand, however, there is no indication that BLM's approval of the lease sales will lead to a violation of the Clean Air Act, or any other pollution control laws.

BLM considered the issue of ozone concentrations in the San Juan Basin through the analysis of the 2003 RMP/EIS and the 2004 EAC Study, and the agency is confident that, even under a worst-case scenario for oil and gas development in the region, none of the areas within the San Juan Basin will exceed the new 0.075 ppm NAAQS for ambient ozone levels. (NEPA 4168, 4210–13.) Plaintiffs do not contest the validity of the 2004 EAC Study or BLM's continuing efforts with the

NMAQB and the Task Force to monitor ozone levels in the region and ensure compliance with the Clean Air Act. (APR 4220–21, 4243; JUL 3784–85, 3795, 3803–04; OCT 4181, 4189–90, 4197–98.) Therefore, the Court cannot say that, by approving the quarterly lease sales, BLM failed to provide for compliance with the Clean Air Act; nor can it say that by approving the sales, as part of BLM's planned oil and gas development in the San Juan Basin, BLM created such a substantial threat of a violation of the NAAQS that its actions were arbitrary and capricious.

There is reason for concern given the new NAAQS and the fact that the region has been close to non-attainment in the past. (APR 4221; JUL 3784; OCT 4181). Yet, while readings at some of the monitoring sites in the San Juan Basin of New Mexico have come close to violating the new NAAQS, the data and modeling demonstrate a downward trend in ozone concentrations. Ultimately, ozone levels in the San Juan Basin are dependent on ozone precursor emissions from numerous sources in the Basin, as well as a number of other factors such as wind and weather. BLM continues to monitor, study, and manage these complexities to ensure that ambient ozone concentrations stay within the levels established by the EPA. Furthermore, approval of the leases alone cannot result in a violation of the NAAQS. Before any drilling or extraction occurs, BLM must approve an APD. If necessary, BLM can deny further development at that time or impose mitigation measures to reduce ozone precursor emissions. Accordingly, Plaintiffs' argument that BLM failed to provide for compliance with federal air quality regulations must fail. Therefore, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 5 of the Ozone Complaint.

## ANALYSIS OF CLAIMS AGAINST FOREST SERVICE

In the Ozone Complaint, Plaintiffs additionally allege several counts against the Forest Service: (**I**) Plaintiffs allege that the Forest Service violated **NEPA** as the 2008 EIS and ROD failed

to adequately analyze a reasonable range of alternatives and failed to take a hard look at the impact that further oil and gas development in the Jicarilla Ranger District would have on air quality (Counts 6 & 7); and (**II**) Plaintiffs allege that the Forest Service violated **NFMA** because the 2008 EIS and ROD were inconsistent with the 1986 RMP, as they failed to ensure protection of visual conditions in a class I wilderness area and to ensure compliance with the NAAQS for ozone (Counts 8 & 9).

## I.   NEPA CLAIMS

Plaintiffs assert that the Forest Service violated NEPA (**A**) by failing in the 2008 EIS and ROD to adequately analyze a reasonable range of alternatives to the proposed expansion of leasing activities (Count 6, OC Doc. 40 ¶¶ 130–34), and (**B**) by failing in the 2008 EIS and ROD to take a hard look at the impact of the proposed expansion of oil and gas activities on air quality in the Jicarilla Ranger District of the Carson National Forest (Count 7, OC Doc. 40 ¶¶ 135–40).

### A.   Alternatives Analysis

"The 'heart' of an EIS is its exploration of possible alternatives to the action an agency wishes to pursue." *Richardson*, 565 F.3d at 708 (quoting 40 C.F.R. § 1502.14).  The agency does not, however, have to analyze every conceivable alternative: "We apply the 'rule of reason' to determine whether an EIS analyzed sufficient alternatives to allow [the agency] to take a hard look at the available options." *Richardson*, 565 F.3d at 709.  Accordingly, "[d]etermination of which alternatives are to be studied is generally a matter left to the discretion of the agency." *San Juan Citizens Alliance v. Norton*, 586 F.Supp. 2d 1270, 1283 (D.N.M. 2008) (citing *Vt. Yankee*, 435 U.S. at 551–52); *see also Lidstone v. Block*, 773 F.2d 1135, 1137 (10th Cir. 1985) ("The suggestion of alternatives is within the discretion of the agency subject to the standard of review.  It is not necessary to include every possible alternative.").  The agency need not "analyze the environmental

48

consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Colo. Envtl. Coal.*, 185 F.3d 1162, 1174 (10th Cir. 1999).  Above all, an agency's evaluation of alternatives must be reasonable, which "is judged with reference to [its] objectives for a particular project." *Richardson*, 565 F.3d at 709.  Accordingly, the Court must "look first to the intended purpose of the proposed action." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001).  "Alternatives that do not accomplish the purpose of an action are not reasonable." *Id.*

In the case at hand, the 2008 EIS considered and eliminated six alternatives from detailed analysis (FS 26643–45) and then considered four alternatives in detail. (FS 26645–80.)  The 2008 EIS considered the following alternatives in detail: (A) a "no action alternative" required by NEPA (FS 26649); (B) an alternative authorizing the leasing of 5,000 acres in the Jicarilla Ranger District, but encouraging unconventional drilling techniques to minimize surface impact (FS 26650–55); (C) an alternative making the remaining unleased portions of the Jicarilla Ranger District unavailable to leasing and amending the forest plan to impose more stringent standards on oil and gas development (FS 26655–58); (D) an alternative authorizing the leasing of the remaining 5,000 acres in the Jicarilla Ranger District and promoting unconventional drilling techniques as in Alternative B, but not establishing any areas of resource concern (FS 26658–59).  The Forest Service adopted Alternative B.  All of the alternatives included mitigation measures to reduce the impact of increased oil and gas development on air quality. (FS26646, 26648, 26773, 27039).

Plaintiffs argue that the Forest Service failed to adequately analyze a reasonable range of leasing alternatives in the 2008 EIS that would reduce ozone precursor emissions while permitting continued oil and gas development in the Jicarilla Ranger District.  (Doc. 79 at 47–49.)  Plaintiffs assert that there are a number of feasible methods currently employed by oil and gas companies that

could reduce or eliminate emissions, but that the 2008 EIS failed to explore these alternatives. (Doc. 79 at 47.) Plaintiffs point to possible technology and timing stipulations they believe feasible, arguing that these measures should have been considered as alternatives to prevent or minimize further degradation of air quality. (Doc. 79 at 49.)

Federal Defendants and Intervenor-Defendants Lessees counter that Plaintiffs failed to identify any such alternatives in their comments to the Draft 2008 EIS, and that these new alternatives were raised only after the publication of the 2008 EIS, despite the Forest Service's notification that environmental objections not raised at the draft stage are waived. (Doc. 84 at 38; Doc 86 at 45.)  The Draft 2008 EIS stated:

> Comments on the proposed action shall be accepted for 45 days following the date of publication in the Federal Register . . . .  It is the responsibility of all individuals and organizations to ensure that their comments are received in a timely manner . . . .
>
> Reviewers have an obligation to structure their participation in the [NEPA] process so that it is meaningful and alerts the agency to the reviewers' position and contentions.  *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978).  Environmental objections that could have been raised at the draft stage may be waived if not raised until after completion of the final [EIS].  *City of Angoon v. Hodel* (9th Circuit, 1986) and *Wisconsin Heritages, Inc. v. Harris*, 490 F. Supp. 1334, 1338 (E.D. Wis. 1980).  Comments on the draft environmental impact statement should be specific and should address the adequacy of the statement and the merits of the alternatives discussed (40 CFR 1503.3).

(FS 17855.)  Plaintiffs forfeited their right to object to the timing and technology alternatives analysis by not raising these issues during the comment period. *See Vt. Yankee*, 435 U.S. at 553; *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004) ("forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action").

The Forest Service also considered and developed several mitigation measures to lessen ozone emissions, including lease stipulations, new forest plan standards and guidelines, and conditions of approval at the APD stage. (Doc. 84 at 39; Doc. 86 at 46.)  The Forest Service worked

with BLM, NMAQB, EPA, local tribes, and others on the Task Force to develop appropriate mitigation measures. (FS 26772.)  As these mitigation measures are mandatory, they did not need to be considered as alternatives.  Furthermore, the agency's decision to rely on the technologies recommended by NMAQB and the Task Force was reasonable, and therefore, Defendants were not required to analyze additional mitigation alternatives. *See Richardson*, 565 F.3d at 708 (applying a "rule of reason").

Lastly, in reviewing the agency's alternatives analysis, the Court must keep in mind "the intended purpose of the proposed action." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001).  "Alternatives that do not accomplish the purpose of an action are not reasonable." *Id*.  The purpose of the 2008 EIS was to open up 5,000 acres of unleased lands in the Jicarilla Ranger District to oil and gas development to help meet the public's need for natural gas. (FS 26607.)  The Forest Service rejected six alternatives that unlawfully prohibited oil and gas development on existing leases, severely limited new development, caused excessive surface impacts, or were not economically feasible. (FS 26643–45.)  As these alternatives did not accomplish the purpose of the proposed action, they were appropriately rejected. *Custer Cty.*, 256 F.3d at 1041.

In conclusion, the Forest Service's alternatives analysis was not arbitrary and capricious.  First, Plaintiffs waived their right to consideration of their technology and timing alternatives by failing to raise these issues in their comments to the Draft 2008 EIS.  Furthermore, even if Plaintiffs had raised these concerns in their comments, the Forest Service did not have to consider them if they were not reasonable.  The agency's reliance on the mitigation measures mandated by NMAQB and the Task Force was reasonable, and therefore, it was not necessary for the Forest Service to consider mitigation alternatives.  Lastly, the Forest Service appropriately rejected those alternatives that did not meet the purpose of the proposed agency action because they either overly restricted oil and gas

51

development or would cause excessive surface impacts.  Therefore, the Forest Service's alternatives analysis was not arbitrary and capricious.  The Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 6 of the Ozone Complaint.

**B.      Hard Look Analysis**

Next, Plaintiffs claim the Forest Service failed in the 2008 EIS and ROD to take a "hard look" at the environmental impacts of the proposed expansion of oil and gas leasing activities on air quality in the Jicarilla Ranger District. (Count 7, OC Doc. 40 ¶¶ 135–40).  NEPA prohibits uninformed agency decision-making by requiring that agencies take a hard look at the environmental consequences of their proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA does not, however, impose any "substantive environmental obligations on federal agencies." *Id.* at 351.  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* at 350.  Accordingly, in reviewing the Forest Service's approval of the oil and gas leases, the Court must focus on whether the Forest Service's actions complied with the relevant procedures proscribed by NEPA, not the alleged environmental consequences. *See Marsh*, 490 U.S. at 385; *Richardson*, 565 F.3d at 704.  Thus, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants . . . ." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).

First, Plaintiffs argue that the Forest Service failed to use the best available scientific information to analyze ozone emissions, as the 2008 EIS contains no quantitative modeling[12] of ozone concentrations. (Doc. 79 at 33.)  In light of the already elevated ozone levels in the region,

---

12.  "Quantitative modeling refers to the process of predicting ambient concentrations of a given pollutant in an area using computer models that consider emission rates, weather, and topography, among other factors." *S. Utah Wilderness Alliance v. Allred*, 2009 WL 765882, at *1 n. 3 (D.D.C. Jan. 17, 2009).

Plaintiffs argue that the Forest Service's analysis of ozone levels fell short of the "hard look" required by NEPA. (Doc. 79 at 34.)  Federal Defendants and Intervenor-Defendants Lessees counter that the 2008 EIS analysis was reasonable, as it contains a more than adequate environmental impact analysis of emissions for the proposed action (FS 26754–74[13]) using a modeling protocol approved by the NMAQB. (Doc. 86 at 34.)

"Courts are not in a position to decide the propriety of competing methodologies . . . , but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Comm. to Preserve Boomer Lake v. Dept. of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993).  Accordingly, there is no requirement that the Forest Service use a particular methodology in its analysis.  Plaintiffs concede this point: "Plaintiffs are not arguing that the Forest Service should have used a specific method to analyze project ozone emissions." (Doc. 79 at 35.)  Citing to *S. Utah Wilderness Alliance v. Allred*, 2009 WL 765882 (D.D.C. Jan. 17, 2009), Plaintiffs insist, however, that quantitative ozone modeling was required.  In that case, however, the district court only concluded that the lack of "quantitative ozone dispersion modeling" demonstrated a "likelihood" of success warranting the imposition of a temporary restraining order (TRO). *Id.* at *1.  As the case is not from the Tenth Circuit, it is only persuasive authority, made less so by the fact the district court's ruling occurred in the context of a TRO.  Plaintiffs cite to no other cases, and therefore, the Court is reluctant to conclude that, as a matter of law, any EIS lacking quantitative ozone dispersion modeling fails NEPA's hard look requirement.

NEPA requires that agencies take a hard look at the environmental consequences of their proposed actions. *Robertson*, 490 U.S. at 350.  "If the adverse environmental effects of the proposed

---

13. In addition to the emissions analysis of the 2008 EIS, Federal Defendants point to the data and air quality analysis that was carried out in preparation for the 2008 EIS. *See* PRINCIPAL INVESTIGATOR'S BACKGROUND INFORMATION FOR PROJECT RECORD (May 21, 2003) (FS 17216–80 & 19555–91).

action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id*. The Forest Service considered, in detail, current ozone and ozone precursor emissions in the area from oil and gas wells and other sources (FS 26756–59), the emissions that would likely result from the proposed alternatives (FS26761–66), the region of influence for ozone and ozone dispersion (FS 26757–61, 26768), current federal and state air quality standards (FS 26755–56), and proposed mitigation measures (FS26772). Ultimately, the agency concluded that "[a] review of the emissions estimated for gas production from the development of 751 new wells shows that the emissions of VOC and NOx . . . would contribute to an increase in emissions from current levels within the region." (FS 26771.) In a region that is already near non-attainment for 8-hour ozone concentrations, the Forest Service reasoned that "the impact of the new district emissions would be significant to ambient [ozone] levels." (*Id*.)

Quantitative modeling, such as that performed in the 2004 EAC Study, may have been helpful to the Forest Service in predicting future ozone levels in the region, but neglecting to perform such an analysis does not mean that the agency's decision was arbitrary and capricious. To the contrary, the Forest Service recognized the already high ambient ozone levels in the region, calculated the ozone precursor emissions for the proposed 724 and 751 new wells scenarios at project years one and twenty, and determined that the development would contribute to an increase in emissions from current levels; consequently, the agency concluded that the proposed action could lead to a violation of the ozone NAAQS. The Forest Service's analysis of this issue was at least as detailed as the 2003 RMP/EIS (FS 14358–59), which this Court found not to be arbitrary and capricious. *San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d at 1290. In the end, the analysis adequately identified the environmental risks of the proposed action and allowed for public

participation. *Robertson*, 490 U.S. at 350.  That is all NEPA requires.

Second, Plaintiffs argue that the Forest Service's air quality analysis was "fundamentally flawed" because it relied on the two gram per horsepower per hour NOx standard, which presented an "illogical and unwarranted assumption" because evidence in the record indicates that engines of this size currently in operation produce six to ten times more NOx. (Doc. 79 at 35–36.)  BLM, however, has imposed a two gram per horsepower per hour NOx standard for new wells drilled within the Jicarilla Ranger District since August 2005. (FS 21848–49; FS 25658.)  Additionally, the Forest Service imposes this as a COA for all new APDs. (FS 26761; FS 26772; FS 27039.)  And in 2008, the EPA imposed similar limitations. In support of their assertion that compressor engines typically produce six to ten times more NOx, Plaintiffs cite to a 2006 study conducted in Rio Arriba County, which relied on data from 2002. (Doc. 79 at 36; FS 27478.023.)  Plaintiffs acknowledge the new requirements by BLM and the Forest Service, which were not in place at the time of the study, but argue that BLM does not enforce the NOx emission limit currently in place. (Doc. 94 at 21.) Plaintiffs cite to a BLM letter to the San Juan Citizens Alliance stating that "[a]t this time we have no records of how many new engines placed in the field actually meet the NOx emission limit." (FS 27478.010.)  The letter, however, also describes the steps that the agency and oil and gas lessees are taking to implement the new standard.  Based on this letter, the Court cannot conclude that lessees do not comply with this requirement or that NOx emissions are actually six to ten times higher.  Accordingly, the Forest Service's use of the two gram per horsepower per hour NOx standard in its air quality analysis was not arbitrary and capricious.

Third, Plaintiffs argue that the Forest Service's three paragraph discussion of cumulative impacts in the 2008 EIS fails to meaningfully address the issue of air quality; Plaintiffs contend that this type of perfunctory analysis is forbidden by NEPA. (Doc. 79 at 42–43.)  Plaintiffs assert that

the Forest Service did not engage in quantitative ozone modeling, but merely considered ozone precursor emissions without relation to the NAAQS; and therefore, the analysis was arbitrary and capricious. (Doc. 79 at 43.)  Federal Defendants respond that Plaintiffs' characterization of the 2008 EIS's air quality analysis downplays the extent of its analysis. (Doc. 86 at 40.)

In addition to the three paragraph Cumulative Impacts Analysis (FS 26773–74), there is considerable data, modeling, and analysis of emissions for ozone precursors VOC, CO, and NOx within the 2008 EIS' larger Air Quality Analysis. (FS 26754–74.)  Furthermore, the Air Quality Analysis places the proposed wells in the context of existing and future emissions and visibility conditions in the region. (FS 26773–74.)  The Court's "job is not to question the wisdom of the [agency's] ultimate decision or its conclusion concerning . . . cumulative impacts," *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999); rather, it is to "examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Id*. at 1177.

The 2008 EIS' modeling of emissions for one and twenty years provides sufficient facts to foster public participation, providing a clear indication of the wells' potential  impact on air quality in the Jicarilla Ranger District.  The cumulative analysis does not include quantitative ozone modeling, but this is not required by law.  In the end, the Jicarilla Ranger District makes up only a small fraction of a percentage of the overall ozone precursor emissions in the Four Corners Region. (FS 26774.)  Current data indicates that the Four Corners region and the San Juan Basin as a whole are near to exceeding the newly revised NAAQS for ozone; accordingly, another such study would add little to the public discourse.  The 2008 EIS Cumulative Impacts Analysis (FS 26773–74) indicates the project's emissions may have a potentially significant impact on visibility and ozone

levels given the current 8-hour ozone concentrations and reasonably foreseeable emissions from other sources.  Considering the 2008 EIS' Air Quality Analysis in its entirety (FS 26754–74), the Forest Service's analysis satisfies NEPA's hard look requirement.

Lastly, Plaintiffs argue, as they did with regard to the BLM's use of the 2004 EAC Report, that the Forest Service cannot tier to a non-NEPA document, in this case, the 2005 Task Force Report. (Doc. 79 at 43.)  Federal Defendants argue that the Forest Service did not tier to the analysis, but only used some of the data from the 2005 Task Force Report in its own analysis.  In other words, the Forest Service did not substitute the Report's analysis for its own. (Doc. 86 at 41.)  Federal Defendants maintain the Forest Service is permitted to reference existing materials in preparing its cumulative environmental impact analysis. *See* 40 C.F.R. § 1502.21; 36 C.F.R. § 220.4(h); *Bark v. BLM*, 643 F.Supp. 2d 1214, 1224 n. 2 (D. Or. 2009) ("the EA is not tiered to the Molalla Watershed Analysis . . . [r]ather, the EA refers to the Molalla Watershed Analysis as additional reference material, which is distinguished in context from the documents tiered to the EA").  Intervenor-Defendants Lessees further point out that the Forest Service only relied upon one line of data from the 2005 Task Force Report[14] to show that the ozone precursor emissions for the Jicarilla Ranger District are a tiny fraction of the ozone emissions for the entire Four Corners region, and the remaining information in the 2008 EIS came from its own data and analysis. (Doc. 84 at 34.)

Improper tiering to a non-NEPA document occurs "when a NEPA document refers to a more general non-NEPA document in order to explain and evaluate the environmental impact of the decision in question." *Alliance for the Wild Rockies v. Kimbell*, 310 Fed. App'x 106, 109 (9th Cir. 2009); *see also* 40 C.F.R. § 1508.28 (defining "tiering").  As the Forest Service did not rely

---

14.  The 2008 EIS only references the 2005 Task Force Report for a single line of data showing the total NOx and VOC emissions from oil and gas development in the Four Corners area. (FS 26774, Table 31, Line 1.)  The remaining emissions data comes from the Forest Service. (FS 26762.)

on the 2005 Task Force Report for its analysis of the cumulative impacts, the mere referencing of the data did not constitute tiering. Therefore, Plaintiffs' tiering argument must fail, as the Forest Service did not rely on the 2005 Task Force Report to replace its analysis. This data was useful to provide perspective, but it was not a substitute for the agency's analysis.

The Court finds that the Forest Service satisfied NEPA's hard look requirement. First, the Forest Service's failure to perform quantitative ozone modeling of future ozone concentrations for the Jicarilla Ranger District was not arbitrary and capricious, as the analysis performed adequately identified the environmental risks of the proposed action and allowed for public participation. *Robertson*, 490 U.S. at 350. Second, the Forest Service's use of the two gram per horsepower per hour NOx standard in its air quality analysis was not arbitrary and capricious as this limit is now required for all new wellhead compressor engines. Third, the Forest Service's cumulative impacts analysis of the project on air quality meaningfully addressed the issue of ozone. The 2008 EIS' modeling of emissions for one and twenty years provides sufficient facts to foster public participation and gives a clear indication of the potential impact of the agency's action on air quality. Lastly, Plaintiffs' improper tiering argument must fail as the Forest Service did not rely on the 2005 Task Force Report to replace its analysis in the 2008 EIS, but merely referenced one line of data to place its emissions analysis in the context of total emissions in the Four Corners area. Consequently, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 7 of the Ozone Complaint.

## II.      NFMA CLAIMS

### A.      Ripeness

Federal Defendants and Intervenor-Defendants Lessees argue that Plaintiffs' NFMA claims are not ripe because the 2008 EIS and ROD did not approve any site-specific, ground-level

disturbances, or authorize any oil and gas operations, and until such time, Plaintiffs' interests cannot be harmed, and judicial review would be inappropriate. (Doc. 84 at 41–43; Doc. 86 at 51–53.) Plaintiffs reply that, in addition to serving as a program-level amendment to the 1986 RMP, the 2008 EIS and ROD authorized BLM to lease fifteen parcels within the Jicarilla Ranger District; therefore, Plaintiffs argue that their claims are ripe, as they challenge the site-specific actions of the 2008 EIS and ROD. (Doc. 94 at 30–31.)

In determining whether an issue is ripe for judicial review, courts undertake a three-part analysis, looking at "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Assoc., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). In *Ohio Forestry*, the Supreme Court found that a challenge to a Forest Service management plan that permitted extensive logging in areas of the Wayne National Forest in southern Ohio was not ripe for judicial review because the plan was not a final decision, but represented only one step in a series of decisions that would have to occur before any on-the-ground disturbance could take place. *Id.* at 729–39.

> Before the Forest Service can permit logging, it must: (a) propose a specific area in which logging will take place . . . ; (b) ensure that the project is consistent with the Plan . . . ; (c) provide those affected by proposed logging notice and an opportunity to be heard . . . ; (d) conduct an environmental analysis pursuant to [NEPA] . . . ; and (e) subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court . . . .

*Id.* at 729–30. Thus, while the Wayne National Forest Plan set out many details about how logging would be conducted, it did not authorize any cutting of trees. *Id.* at 729. Additionally, the Plan did not "command anyone to do anything or to refrain from doing anything"; it did not "grant, withhold, or modify any formal legal licence, power, or authority"; and it did not create any "legal rights or

obligations." *Id.* at 733.  Hence, the U.S. Supreme Court concluded the claims were not yet ripe because the plaintiff would "have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Id.* at 734.

Intervenor-Defendants Lessees assert that Plaintiffs do not have standing in the case at hand because, like *Ohio Forestry*, the Forest Service's leasing decision does not authorize any site-specific, ground disturbing activities, and before any such activity can take place, BLM must prepare an environmental analysis, the Forest Service must approve a surface use plan of operations, and BLM must issue a permit to drill. (Doc. 84 at 42.)  Thus, Intervenor-Defendants argue that Plaintiffs will not be harmed because they will have the opportunity to challenge any site-specific leasing plans at the APD stage. (Doc. 84 at 42.)  Additionally, Intervenor-Defendants assert that judicial review at this time would interfere with the site-specific review the Forest Service and BLM must perform at the leasing and APD stage. (Doc. 84 at 43.)

The mere formulation and approval of a forest management plan by the Forest Service is not justiciable because it does not result in any imminent harm.  The Forest Service's ROD in the case at hand, however, constitutes "a leasing decision for specific lands . . . currently unleased on the Jicarilla Ranger District and any leases that expire or are relinquished in the future." (FS 27320.) The leasing decision "authorize[s] the Bureau of Land Management (BLM) to lease approximately 5,000 acres of currently unleased National Forest System lands on the Jicarilla Ranger District." (FS 27321.)  The decision "incorporates the lease terms and stipulations" and specifically identifies the fifteen parcels to be leased. (FS 27323–25.)  Accordingly, unlike the Plan in *Ohio Forestry*, the Forest Service's leasing decision in this case had an impact on the parties' legal rights.

The Forest Service's action in approving the leasing of 5,000 additional acres represents a final agency action that could result in imminent concrete injury to Plaintiffs, who will not be able

to seek further review of the Forest Service's actions under NFMA.  Thus, delaying review would cause hardship to Plaintiffs.  Plaintiffs could still seek review of BLM's approval of the lease sales and the permits to drill under NEPA and FLPMA, but their opportunity to challenge the Forest Service's leasing decision under NFMA will have passed.  The Forest Service must additionally approve any future lessee's surface use plan that is submitted with the APD, but this does not occur until after the parcel has been leased by BLM, and the lessee has acquired legal rights in the land.  36 C.F.R. § 228.106.  Consequently, in the leasing context, the ROD and the Forest Service's leasing decision constitute final agency action authorizing specific activities. *Cf. San Juan Citizens Alliance v. Norton*, 596 F. Supp. 2d 1270, 1295 (D.N.M. 2008) ("Plaintiffs' claim fails at this stage because their challenge is to the RMP as a whole, rather than to a discrete final agency action authorizing specific activities, and, as such, it is not ripe for review.").

    In sum, the facts of the case at hand can be distinguished from *Ohio Forestry* and other RMP standing cases.  Unlike those cases, where the agency was merely approving a management plan, here, delayed review could cause hardship to Plaintiffs, who will have no future opportunities to challenge the Forest Service's leasing decision under NFMA.  Additionally, in the case at hand, judicial intervention would not interfere with further agency action because there will be no future opportunities for the Forest Service to revise its leasing decision or make site-specific decisions about leasing.  The Court therfore concludes that the matter is ripe for judicial review.

    **B.    NFMA Analysis**

    Having concluded that the matter is justiciable, the Court must consider the merits of Plaintiffs' NFMA claims.  Under NFMA, the Forest Service is required to prepare land management plans for each unit of the national forest system. *See* 16 U.S.C. § 1604(b).  The "consistency provision" of NFMA prohibits the Forest Service from taking any action that is inconsistent with

these plans. § 1604(i) ("Resource plans and permits contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 228.107(a)(2); *Utah Envtl. Congress v. Richmond*, 483 F.3d at 1135 ("To be sure, the Forest Service is required to comply with existing forest plans.").  The Carson National Forest is managed under the 1986 RMP. (FS 1583–1849.)  The 1986 RMP requires that the Forest Service "manage the air resources in federally designated class I air quality areas [such as the Wheeler Peak Wilderness in the Carson National Forest] as mandated by law" and ensure that "air quality will be equal to or better than that required by the applicable Federal, State and/or local standards or regulations." (FS 1625.)  Plaintiffs allege that the Forest Service violated NFMA because the 2008 EIS and ROD were inconsistent with the 1986 RMP as they (1) failed to ensure protection of visual conditions in a class I wilderness area (Count 8), and (2) failed to ensure compliance with the NAAQS for ambient ozone levels (Count 9). (Doc. 79 at 59–65.)

Federal Defendants argue that the NFMA's "consistency provision" does not apply to the 2008 EIS and ROD because it is not a resource plan, permit, contract, or other instrument for the use and occupancy of Forest System lands. (Doc. 86 at 53.)  Federal Defendants assert that the consistency provision has only been applied to site-specific project decisions authorizing ground-disturbing activities. (Doc. 86 at 54.)  Yet, the ROD authorizes the leasing by BLM of fifteen separate parcels of National Forest System lands for oil and gas development.  While this leasing and the use of the land is subject to certain stipulations, the ROD clearly authorizes the "use and occupancy" of these lands for the purpose of oil and gas development.  Accordingly, Federal Defendants' argument that the consistency provision does not apply must fail.

Next, Intervenor-Defendants argue that the Forest Service does not have authority to regulate air, as the NFMA does not delegate to the Forest Service authority to regulate under the Clean Air

Act; therefore, compliance with federal visibility or air quality standards is not the Forest Service's responsibility. (Doc. 84 at 44–45.)  Intervenor-Defendants assert that Plaintiffs incorrectly suggest (Doc. 79 at 63) that the Clean Air Act imposes upon the Forest Service an affirmative duty to implement the Act's Prevention of Significant Deterioration (PSD) program. (Doc. 84 at 45 n. 16.) Section 165 of the Clean Air Act states the following:

> The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands shall have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a class I area and to consider, in consultation with the Administrator, whether a proposed major emitting facility will have an adverse impact on such values.

42 U.S.C. § 7475(d)(2)(B).  The 1986 RMP states that the Forest Service, as the federal land manager responsible for protecting class I wilderness areas, has "the responsibility to protect these areas by making recommendations to the regulatory agency regarding issuance of [PSD] permits for proposed new sources." (FS 1625.)  Accordingly, Intervenor-Defendants argue that the Forest Service only has the authority to make recommendations to the EPA. (Doc. 84 at 45 n. 16.)

Nevertheless, the 1986 RMP additionally requires that "[m]anagement activities will be planned so that air quality will be equal to or better than that required by the applicable Federal, State and/or local standards or regulations." (FS 1625.)  This requires the Forest Service to go beyond merely making recommendations to the EPA about PSD permits, but requires it to take affirmative steps in its management activities to ensure that air quality stays within those levels mandated by federal or state air quality laws and regulations.  Additionally, as the Clean Air Act defines air quality not only in terms of pollution levels, but also "visibility," *see* 42 U.S.C. § 7475(d)(2)(B), the Forest Service has an affirmative duty in its management activities, including the approval of additional leasing in the Jicarilla Range District, to take steps to ensure that visibility in the Wheeler Peak Wilderness meets federal standards for a class I wilderness area.  This does not

63

mean that the Forest Service is required to enforce the Clean Air Act, but only that in approving any leasing or oil and gas development project, it is required to take appropriate steps to ensure that the agency's actions do not result in a violation of the Clean Air Act's air quality standards.

At the end of the day, it is not clear that the Forest Service's leasing decision will result in a violation of state or federal air quality standards.  Plaintiffs argue that without imposing appropriate pollution controls (1) visibility in the Wheeler Peak Wilderness will exceed federal standards for class I wilderness (Doc. 79 at 60–64), and (2) already high ozone levels in the region will exceed the NAAQS for ambient ozone levels (Doc. 79 at 64–65).  The Forest Service, however, acknowledged these issues, and to avoid a violation of federal pollution laws, the agency required that mitigation measures be imposed on any new wells in the Jicarilla Ranger District.

> The air quality analysis in this report along with other studies in the Four Corners Region clearly show that mitigation measures must be implemented in order to avoid excessive levels of ozone and $NO_2$ pollution and to protect visibility in Class I areas. The Forest Service is an active participant in the Four Corners Air Quality Task Force and supports implementation of mitigation measures developed by that group. The NM Air Quality Bureau and the Bureau of Land Management have already negotiated lower NOx emission standards for wellhead compressors as a result of the Task Force work.  Any new wells developed in the Jicarilla Ranger District would be required to comply with these same standards.

(FS 26772; *see also* FS 26755.)   Plaintiffs counter that this commitment to mitigation is disingenuous (Doc. 94 at 34), as the major source of NOx emissions in the area comes from small wellhead compressors, which "generally are unregulated by the NMAQB permitting process." (FS 26773.)  Yet, the 2008 EIS goes on to say that "[m]easures have been adopted by NMAQB and BLM that would limit the NOx emission factor of any proposed wellhead compressor to 2 gm/hp-hr." (FS 26773.)  The 2008 EIS also discusses the implementation of an "incentive program . . . that would encourage the use of add-on control devices on wellhead compressors, such as catalytic converters."  (FS 26773.)  In the end, the Forest Service took appropriate steps to ensure that its

64

leasing decision would not lead to a violation of federal or state air quality standards.  Accordingly, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Counts 8 and 9 of the Ozone Complaint.

**PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF**

As part of their requested relief, Plaintiffs ask (1) that the Court hold unlawful and set aside the leases for the thirty-three parcels that BLM sold in the April, July, and October 2008 lease sales, (2) that the Court enjoin any oil and gas activities on the leased parcels, and (3) that the Court enjoin the issuance of any leases on the 5,000 acres of the Jicarilla Ranger District opened to leasing by the 2008 EIS and ROD. (Doc. 79 at 65–66; OC Doc. 40 at 34–35.)  Given my denial of Plaintiffs' Petition for Review of Agency Action and dismissal of all counts of the Ozone Complaint, the Court denies Plaintiffs' request for injunctive relief.

**CONCLUSION**

In Count 1 of the Ozone Complain, Plaintiffs allege BLM's EA/FONSIs with regard to the April, July, and October 2008 quarterly oil and gas lease sales were legally inadequate and violated NEPA and the APA because they failed to fully analyze the direct, indirect, and cumulative impacts the lease sales would have on air quality in the San Juan Basin. (OC Doc. 40 ¶¶ 97–102.)  The Court finds that BLM satisfied NEPA's "hard look" requirement; therefore, this portion of Plaintiffs' Petition for Review of Agency Action is denied, and the Court dismisses Count 1.

In Count 2 of the Ozone Complaint, Plaintiffs allege that BLM's EA/FONSIs for the quarterly oil and gas lease sales were legally inadequate and violated NEPA and the APA because they failed to analyze a reasonable range of alternatives. (OC Doc. 40 ¶¶ 103–08.)  BLM's alternatives analysis was not arbitrary and capricious, as BLM met its pre-leasing obligation to study, develop, and describe a range of appropriate alternatives.  Therefore, the Court denies this

portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 2.

In Count 3 of the Ozone Complaint, Plaintiffs allege that BLM violated NEPA and the APA by failing to prepare EISs before approving the quarterly oil and gas lease sales and by not preparing EISs before denying Plaintiffs protests to the April, July, and October 2008 lease sales. (OC Doc. 40 ¶¶ 109–14.)  BLM prepared EA/FONSIs for each of the three lease sales.  Without more concrete development plans, a detailed analysis of ozone impacts would constitute a misallocation of resources, and BLM's decision not to prepare EISs and to defer additional analysis until the APD stage was not arbitrary and capricious.  Accordingly, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 3.

In Count 4 of the Ozone Complaint, Plaintiffs allege that BLM violated NEPA and the APA by failing to involve the public in the NEPA process. (OC Doc. 40 ¶¶ 115–21.)  BLM published Notices of the Lease Sales, made copies of the EAs available to the public at its Farmington office, listed the EAs on BLM's website in the NEPA logs, and permitted protests.  This constituted more than adequate public involvement for the issuance of an EA/FONSI.  Consequently, the Court finds that BLM satisfied NEPA's public participation requirement, denies this portion of Plaintiffs' Petition for Review of Agency Action, and dismisses Count 4.

In Count 5 of the Ozone Complaint, Plaintiffs allege that BLM violated FLPMA and the APA by failing to provide for compliance with federal air quality standards for ozone prior to authorizing the quarterly oil and gas lease sales or denying the protests to the lease sales. (OC Doc. 40 ¶¶ 122–29.)  BLM's approval of the quarterly lease sales was not arbitrary and capricious because the agency reasonably relied on the data and analysis available to it, which indicated its actions would not result in a violation of applicable pollution control laws.  Therefore, the Court concludes that BLM's actions did not violate FLPMA, denies this portion of Plaintiffs'

Petition for Review of Agency Action, and dismisses Count 5.

In Count 6 of the Ozone Complaint, Plaintiffs allege the Forest Service violated NEPA and the APA because the 2008 EIS failed to analyze a reasonable range of alternatives. (OC Doc. 40 ¶¶ 130–34.)  First, Plaintiffs waived their right to claim the Forest Service failed to consider their proposed technology and timing alternatives by failing to raise these issues in their comments to the Draft 2008 EIS.  Furthermore, the agency's reliance on the technologies recommended by NMAQB and the Task Force was reasonable, and not considering additional mitigation measures was not arbitrary and capricious.  Finally, the Forest Service appropriately rejected those alternatives that did not meet the purpose of the proposed agency action because they either overly restricted oil and gas development or would cause excessive surface impacts.  Accordingly, the Forest Service's alternatives analysis was not arbitrary and capricious, and the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 6.

In Count 7 of the Ozone Complaint, Plaintiffs allege that the Forest Service violated NEPA and the APA because the 2008 EIS did not adequately analyze the direct, indirect, and cumulative impacts on air quality of permitting oil and gas leasing and development on 5,000 unleased acres in the Jicarilla Ranger District. (OC Doc. 40 ¶¶ 135–40.)  First, the Forest Service's failure to perform quantitative modeling of future ozone concentrations for the Jicarilla Ranger District was not arbitrary and capricious, as the analysis performed adequately identified the environmental risks of the proposed action and allowed for public participation.  Second, the Forest Service's use of the two gram per horsepower per hour NOx standard in its air quality analysis was not arbitrary and capricious as this limit is now required by law on all new compressor engines.  Third, the Forest Service's cumulative impacts analysis of the project on air quality meaningfully addressed the issue of ozone.  Lastly, Plaintiffs' improper tiering argument must fail as the Forest Service did not rely

on the 2005 Task Force Report to replace its analysis in the 2008 EIS.  Consequently, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Count 7 of the Ozone Complaint.

In Counts 8 and 9 of the Ozone Complaint, Plaintiffs assert that the Forest Service violated NFMA and APA because the 2008 EIS and ROD were inconsistent with the 1986 RMP by failing to ensure maintenance of high quality visual conditions in a class I wilderness area (OC Doc. 40 ¶¶ 141–44), and by failing to ensure compliance with the NAAQS for ozone. (OC Doc. 40 ¶¶ 145–48.)  The agency took appropriate steps in its management activities to ensure that its leasing decision would not lead to a violation of federal or state air quality standards. Accordingly, the Court denies this portion of Plaintiffs' Petition for Review of Agency Action and dismisses Counts 8 and 9 of the First Amended Complaint.

Lastly, given the Court's denial of Plaintiffs' Petition for Review of Agency Action and dismissal of all counts of the Ozone Complaint, Plaintiffs are not entitled to injunctive relief.


**WHEREFORE**, the Court hereby **DENIES** Plaintiffs' Petition for Review of Agency Action and request for injunctive relief (Doc. 79) and **DISMISSES** all counts of the Ozone Complaint (OC Doc. 40).


_____
**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**